# UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

| | |
|---|---|
| ANDREA CANNON, on behalf of herself and all others similarly situated, | Case No. _____ |
| Plaintiff, | Removed from the Superior Court of the District of Columbia |
| v. | Civil Action No. 2012 CA 002101 B |
| WELLS FARGO BANK, N.A.; | |
| WELLS FARGO INSURANCE, INC.; | |
| QBE SPECIALTY INSURANCE CO.;<br>Wall Street Plaza<br>88 Pine Street<br>New York, NY 10005, | |
| and<br>STERLING NATIONAL INSURNACE<br>AGENCY, INC. (n/k/a QBE FIRST<br>INSURANCE AGENCY, INC.),<br>210 Interstate North Parkway<br>Atlanta, GA 30339, | |
| Defendants. | |

## NOTICE OF REMOVAL

Defendants QBE Specialty Insurance Company and QBE FIRST Insurance Agency, Inc. (f/k/a Sterling Insurance Agency, Inc.) (together "QBE" or "the QBE Defendants"), by their undersigned attorneys, pursuant to 28 U.S.C. §§ 1331, 1332, 1441, and 1446, file this Notice of Removal of this civil action from the Superior Court of the District of Columbia to the United States District Court for the District of Columbia, and for cause state:

**Nature of the Case**

1. On March 5, 2012, Plaintiff filed the above captioned Complaint in Superior Court of the District of Columbia, a copy of which is attached hereto as Exhibit A.

2. The QBE Defendants were served on March 7, 2012.

3. Plaintiff Andrea Cannon brought this action individually and seeks to represent a putative class of similarly situated individuals in the District of Columbia.[1]  (Exhibit A, ¶¶ A, 1.)

4. Plaintiff Andrea Cannon and members of the putative Class ("Plaintiffs") allege that the QBE Defendants and Defendants Wells Fargo Bank, N.A. ("Wells Fargo") and Wells Fargo Insurance, Inc., charged excessive rates for the Lender Placed Insurance ("LPI") policies at issue in the case.  Plaintiffs allege the following causes of action against the QBE Defendants: unjust enrichment (Count 2); fraudulent material misrepresentation of material facts and fraudulent concealment of material facts and fraudulent omission of material facts (Count 3); fraud and conversion (Count 6); and unconscionability (Count 7).  Plaintiff also asserts violations of the DC

---

[1] Plaintiff's Complaint contains internal inconsistencies regarding the class definition.  In paragraph A, Plaintiff states that she seeks to bring this action "as an individual and on behalf of others similarly situated in the District of Columbia."  In paragraph 1, Plaintiff states that this action was filed "to redress injuries that Plaintiff and other residents and citizens of the District of Columbia suffered . . . ."  In paragraph 47, however, Plaintiff proposes a class definition that is not limited by geography, and in paragraph 50 Plaintiff refers to mortgage loans in the District of Columbia and nationwide when discussing the potential class size.  Given these inconsistencies, the QBE Defendants are unsure what Plaintiff's intentions are.  The QBE Defendants believe, however, that a District of Columbia class was intended in light of the fact that Plaintiff filed a similar lawsuit against the same Defendants in federal court in Maryland just a few weeks before filing this action in DC Superior Court.  *See Cannon v. Wells Fargo Bank, N.A.*, No. RWT 12 CV 0377 (D. Md. Feb. 7, 2012) (Amended Complaint filed on Feb. 23, 2012).  As a result, the QBE Defendants will proceed at this stage of the proceeding as if a DC class has been alleged.  If the purported class is nationwide, however, Defendants arguments in favor of removal of this action to federal court are even stronger as the potential class size and amount of damages at stake would obviously be much larger.

Consumer Protection Procedures Act and the Truth in Lending Act as part of Count 3.

5. Named Plaintiff Andrea Cannon is a resident of Maryland. (*See* Exhibit A, (case caption listing Cannon's address).)

6. Defendant QBE Specialty Insurance Company ("QBE Specialty") is incorporated in North Dakota and has its principal place of business in New York. (Exhibit B, ¶ 3 (Declaration of Mark Chapman).)

7. Defendant QBE FIRST Insurance Agency, Inc. (f/k/a Sterling Insurance Agency, Inc.) ("QBE FIRST") is incorporated in California and has its principal place of business in Georgia. (Exhibit B, ¶ 4.)

## Removal Based on the Class Action Fairness Act

8. This Court has jurisdiction over this action under 28 U.S.C. § 1332(d)(2), which provides in pertinent part: "district courts shall have original jurisdiction of any civil action in which the matter in controversy exceeds the sum or value of $5,000,000, exclusive of interest and costs, and is a class action in which – (A) any member of a class of plaintiffs is a citizen of a State different from any defendant . . . ."

9. There is diversity of citizenship between Plaintiffs and Defendants in this case because the citizenship of any one member of the putative class differs from that of at least one defendant. *See* 28 U.S.C. § 1332(d)(2)(A).

10. The named Plaintiff, Andrea Cannon, is a citizen of Maryland. Additionally, Plaintiff's attempt to certify a class of individuals situated in the District of Columbia, *i.e.*, individuals who own real property in the District of Columbia,

indicates that at least one of the putative class members is a resident of the District of Columbia.

11. The QBE Defendants are not residents of the District of Columbia or Maryland.  (Exhibit B, ¶¶ 3-4.)  As a result, minimal diversity exists.

12. The Class Action Fairness Act's numerosity requirement that "the number of members of all proposed plaintiff classes in the aggregate" be 100 or greater, is satisfied.  *See* 28 U.S.C. § 1332(d)(5)(B).

13. Plaintiffs have pled that the numerosity requirement of Rule 23 of the Superior Court Rules of Civil Procedure is met for purposes of certifying a class action.  Plaintiffs assert that "[t]he Defendants sell and service hundreds of thousands, if not millions, of mortgage loans and insurance policies in the District of Columbia and nation-wide." (*See* Exhibit A, ¶ 50.)  More specifically, Plaintiffs allege that the putative class is "certainly more than a thousand." (*See* Exhibit A, ¶ 50.)  QBE FIRST's business records indicate that between March 5, 2009 and March 5, 2012, 738 Wells Fargo borrowers in the District of Columbia were charged for LPI hazard policies that were placed by QBE FIRST and not subsequently cancelled in full.  (Exhibit B, ¶ 7.)  Thus, while the QBE Defendants deny that this lawsuit is properly maintained as a class action and reserve the right to challenge class certification, Plaintiff has alleged a class size that satisfies the federal jurisdiction requirements of the Class Action Fairness Act.

14. The face of the complaint in this case makes it clear that Plaintiffs are seeking more than $5,000,000 from the QBE Defendants.  (*See, e.g.*, Exhibit A, ¶ 83

(seeking punitive damages in the amount of "$20,000,000 for [the named

Plaintiff] and each Class Member and compensatory damages"; Exhibit A, ¶

101[2] (seeking punitive damages in the amount of $5,000,000 and $5,000,000

in compensatory damages for the named Plaintiff "and the same relief for each

Class Member"). Thus, while the QBE Defendants deny that Plaintiff or any

putative class member is entitled to compensatory or punitive damages in

these or any amounts, the damages sought by Plaintiff satisfies the amount in

controversy requirement of federal jurisdiction pursuant to the Class Action

Fairness Act. *See Lewis v. Ford Motor Co.*, 610 F. Supp. 2d 476, 486 (W.D.

Penn. 2009) (including plaintiff's assertion for punitive damages in the

amount in controversy calculation); *Walker v. Motricity Inc.*, 627 F. Supp. 2d

1137, *rev'd on other grounds,* 1141 (N.D. Cal. 2009) (noting that a court

should look beyond the complaint to determine the amount in controversy if it

was not pled on the face of the complaint); *Plummer v. Farmers Group, Inc.*,

388 F. Supp. 2d 1310, 1318 (E.D. Okla. 2005) (denying plaintiff's motion to

remand case to state court because Plaintiff did not stipulate that the ultimate

amount sought was less than $5,000,000); *Rippee v. Boston Market Corp.*, 408

F. supp. 2d 982, 984 (S.D. Cal. 2005) (noting that the amount in controversy

is generally determined from the face of the complaint).

15. Furthermore, Plaintiffs seek additional damages from Wells Fargo Bank, N.A.

and Wells Fargo Insurance, Inc., in causes of action not asserted against the

QBE Defendants. (*See generally* Exhibit A.)

---

[2] This paragraph is listed as "1001" in the Complaint but the paragraph comes immediately after paragraph 100 and immediately before paragraph 102. Accordingly, the QBE Defendants will refer to this paragraph as paragraph 101.

**Federal Question Jurisdiction**

16. This Court also has jurisdiction over this matter under 28 U.S.C. § 1331 because plaintiff asserts violations of the laws of the United States, namely the Truth in Lending Act ("TILA"), 15 U.S.C. § 1601 et. seq. (Exhibit A, ¶¶ 41, 81.) Although Plaintiff's TILA claim is so ambiguous that, as the QBE Defendants will argue in their motions to dismiss, it fails to state a claim for which relief can be granted, Plaintiff's argument that TILA has been violated relates to the charging of lender-placed insurance premiums as part of a borrower's monthly payment or as an addition to the borrower's principal balance.

17. This Court has supplemental jurisdiction over the remaining state law claims because they "form part of the same case or controversy." 28 U.S.C. § 1367(a). A state claim is part of the same case or controversy as a federal claim if they share a "common nucleus of operative fact" with the federal claim. *See, e.g., Busby v. Capital One, N.A.*, 759 F. Supp. 2d 81, 83-85 (D. D.C. 2011) (exercising supplemental jurisdiction over D.C. law claims that arose out of the same facts as an alleged RICO violation).

18. All of the Plaintiffs' allegations relate to the lender-placed insurance coverage and premiums that the Complaint admits were authorized by the terms of Plaintiff's Deed of Trust. This is the same Deed of Trust and lender-placed insurance premiums that are at issue in the alleged violation of the Truth in Lending Act.

## Removal Procedures

19. Because the Class Action Fairness Act provides that jurisdiction over this matter is held by the federal district courts, the QBE Defendants remove this case to the United States District Court for the District of Columbia, which is the district and division that embraces the place where the state court action was filed. *See* 28 U.S.C. § 1441(a).

20. In accordance with 28 U.S.C. § 1446(d), the QBE Defendants have given contemporaneous written notice of this Notice of Removal to adverse parties and the clerk of the Superior Court of the District of Columbia.

21. A copy of all process, pleadings, and orders served upon the QBE Defendants in this matter are attached hereto as Exhibits A (the complaint) and C (a current copy of the docket). *See* 28 U.S.C. § 1446(a).

22. Although consent of all defendants is not required for removal of a class action under the Class Action Fairness Act, *see* 28 U.S.C. § 1453(b), each of the named defendants in this case consents to removal.

23. This Notice of Removal is being filed within thirty days of March 7, 2012, the date on which the QBE Defendants were served in this matter. *See* 28 U.S.C. § 1446.  Accordingly, removal is timely.

## Conclusion

WHEREFORE, the QBE Defendants respectfully request the above-captioned action now pending in the Superior Court for the District of Columbia, be removed to the United States District Court for the District of Columbia, and that said U.S. District Court

assume jurisdiction of this action and enter such other and further orders as may be

necessary to accomplish the requested removal and promote the ends of justice.


Dated: March 27, 2012                              Respectfully submitted,

Robyn C. Quattrone
D.C. Bar No. 462782
rquattrone@buckleysandler.com
BuckleySandler LLP
1250 24th Street NW, Suite 700
Washington, DC 20037
Telephone: (202)349-8035
Fax: (202) 349-8080
Jennifer A. Slagle Peck
D.C. Bar No. 990596
jslaglepeck@buckleysandler.com
BuckleySandler LLP
1250 24th Street NW, Suite 700
Washington, DC 20037
Telephone: (202)349-8027
Fax: (202) 349-8080
*Counsel for Defendants QBE
Specialty Insurance Company and
QBE FIRST Insurance Agency, Inc.
(f/k/a Sterling National Insurance
Agency, Inc.)*

## CERTIFICATE OF SERVICE

I certify that a true and correct copy of the foregoing was filed by hand in United States District Court for the District of Columbia and served on March 27, 2012 via the DC Superior Court's Electronic Case Filing System and the United States Postal Service, as noted below, on counsel of record below.

*Jennifer Slagle Peck / AMR*

Jennifer A. Slagle Peck

## SERVICE LIST

Harry T. Spikes
D.C. Bar No. 372091
P.O. Box 23828
L'Enfant Plaza SW
Washington, DC 20026
(202) 288-4175
*Counsel for Plaintiff Andrea J Cannon*
Via U.S. Mail and CaseFileXpress


Wells Fargo Bank, N.A.
PO Box 8129
Jacksonville, FL 32239
Via U.S. Mail


Wells Fargo Insurance, Inc.
PO Box 8129
Jacksonville, FL 32239
Via U.S. Mail

# EXHIBIT A



# SUPERIOR COURT OF THE DISTRICT OF COLUMBIA
## CIVIL DIVISION

ANDREA CANNON
    Vs.                                    C.A. No.     2012 CA 002101 B
WELLS FARGO, BANK N.A et al

## INITIAL ORDER AND ADDENDUM

Pursuant to D.C. Code § 11-906 and District of Columbia Superior Court Rule of Civil Procedure ("SCR Civ") 40-I, it is hereby **ORDERED** as follows:

(1) Effective this date, this case has assigned to the individual calendar designated below. All future filings in this case shall bear the calendar number and the judge's name beneath the case number in the caption. On filing any motion or paper related thereto, one copy (for the judge) must be delivered to the Clerk along with the original.

(2) Within 60 days of the filing of the complaint, plaintiff must file proof of serving on each defendant: copies of the Summons, the Complaint, and this Initial Order. As to any defendant for whom such proof of service has not been filed, the Complaint will be dismissed without prejudice for want of prosecution unless the time for serving the defendant has been extended as provided in SCR Civ 4(m).

(3) Within 20 days of service as described above, except as otherwise noted in SCR Civ 12, each defendant must respond to the Complaint by filing an Answer or other responsive pleading. As to the defendant who has failed to respond, a default and judgment will be entered unless the time to respond has been extended as provided in SCR Civ 55(a).

(4) At the time and place noted below, all counsel and unrepresented parties shall appear before the assigned judge at an Initial Scheduling and Settlement Conference to discuss the possibilities of settlement and to establish a schedule for the completion of all proceedings, including, normally, either mediation, case evaluation, or arbitration. Counsel shall discuss with their clients **prior** to the conference whether the clients are agreeable to binding or non-binding arbitration. **This order is the only notice that parties and counsel will receive concerning this Conference.**

(5) Upon advice that the date noted below is inconvenient for any party or counsel, the Quality Review Branch (202) 879-1750 may continue the Conference **once**, with the consent of all parties, to either of the two succeeding Fridays. Request must be made not less than six business days before the scheduling conference date. No other continuance of the conference will be granted except upon motion for good cause shown.

(6) Parties are responsible for obtaining and complying with all requirements of the General Order for Civil cases, each Judge's Supplement to the General Order and the General Mediation Order. Copies of these orders are available in the Courtroom and on the Court's website http://www.dccourts.gov/.

Chief Judge Lee F. Satterfield

Case Assigned to: Judge TODD E EDELMAN
Date:  March 5, 2012
Initial Conference: 9:30 am, Friday, June 15, 2012
Location:  Courtroom A-49
          515 5th Street NW
          WASHINGTON, DC  20001                           Caio.doc

## ADDENDUM TO INITIAL ORDER AFFECTING
## ALL MEDICAL MALPRACTICE CASES

In accordance with the Medical Malpractice Proceedings Act of 2006, D.C. Code § 16-2801, et seq. (2007 Winter Supp.), "[a]fter an action is filed in the court against a healthcare provider alleging medical malpractice, the court shall require the parties to enter into mediation, without discovery or, if all parties agree[,] with only limited discovery that will not interfere with the completion of mediation within 30 days of the Initial Scheduling and Settlement Conference ("ISSC"), prior to any further litigation in an effort to reach a settlement agreement. The early mediation schedule shall be included in the Scheduling Order following the ISSC. Unless all parties agree, the stay of discovery shall not be more than 30 days after the ISSC." D.C. Code § 16-2821.

To ensure compliance with this legislation, on or before the date of the ISSC, the Court will notify all attorneys and *pro se* parties of the date and time of the early mediation session and the name of the assigned mediator. Information about the early mediation date also is available over the internet at https://www.dccourts.gov/pa/. To facilitate this process, all counsel and *pro se* parties in every medical malpractice case are required to confer, jointly complete and sign an EARLY MEDIATION FORM, which must be filed no later than ten (10) calendar days prior to the ISSC. Two separate Early Mediation Forms are available. Both forms may be obtained at www.dccourts.gov/medmalmediation. One form is to be used for early mediation with a mediator from the multi-door medical malpractice mediator roster; the second form is to be used for early mediation with a private mediator. Both forms also are available in the Multi-Door Dispute Resolution Office, Suite 105, 515 5th Street, N.W. (enter at Police Memorial Plaza entrance). Plaintiff's counsel is responsible for eFiling the form and is required to e-mail a courtesy copy to earlymedmal@dcsc.gov. *Pro se* Plaintiffs who elect not to eFile may file by hand in the Multi-Door Dispute Resolution Office.

A roster of medical malpractice mediators available through the Court's Multi-Door Dispute Resolution Division, with biographical information about each mediator, can be found at www.dccourts.gov/medmalmediation/mediatorprofiles. All individuals on the roster are judges or lawyers with at least 10 years of significant experience in medical malpractice litigation. D.C. Code § 16-2823(a). If the parties cannot agree on a mediator, the Court will appoint one. D.C. Code § 16-2823(b).

The following persons are required by statute to attend personally the Early Mediation Conference: (1) all parties; (2) for parties that are not individuals, a representative with settlement authority; (3) in cases involving an insurance company, a representative of the company with settlement authority; and (4) attorneys representing each party with primary responsibility for the case. D.C. Code § 16-2824.

No later than ten (10) days after the early mediation session has terminated, Plaintiff must eFile with the Court a report prepared by the mediator, including a private mediator, regarding: (1) attendance; (2) whether a settlement was reached; or, (3) if a settlement was not reached, any agreements to narrow the scope of the dispute, limit discovery, facilitate future settlement, hold another mediation session, or otherwise reduce the cost and time of trial preparation. D.C. Code § 16-2826. Any Plaintiff who is *pro se* may elect to file the report by hand with the Civil Clerk's Office. The forms to be used for early mediation reports are available at www.dccourts.gov/medmalmediation.

Chief Judge Lee F. Satterfield

Caio.doc



**Superior Court of the District of Columbia**
**CIVIL DIVISION**
500 Indiana Avenue, N.W., Suite 5000
Washington, D.C. 20001 Telephone: (202) 879-1133

_Andrea Cannon_
_____
                                    Plaintiff

Case Number  **0002101-12**

vs.

_QBE Specialty Insurance Corp._
_QBE First_
_210 Interstate North_   Defendant
_Parkway Atlanta Ga 30339_

**SUMMONS**

To the above named Defendant:

You are hereby summoned and required to serve an Answer to the attached Complaint, either personally or through an attorney, within twenty (20) days after service of this summons upon you, exclusive of the day of service. If you are being sued as **an officer or agency of the United States** Government or the District of Columbia Government, you have **sixty (60) days after service of this** summons to serve your Answer. A copy of the Answer must be mailed to the attorney for the party plaintiff who is suing you. The attorney's name and address appear below. If plaintiff has no attorney, a copy of the Answer must be mailed to the plaintiff at the address stated on this Summons.

You are also required to file the original Answer with the Court in Suite 5000 at 500 Indiana Avenue, N.W., between 8:30 a.m. and 5:00 p.m., Mondays through Fridays or between 9:00 a.m. and 12:00 noon on Saturdays. You may file the original Answer with the Court either before you serve a copy of the Answer on the plaintiff or within five (5) days after you have served the plaintiff. If you fail to file an Answer, judgment by default may be entered against you for the relief demanded in the complaint.

_Harry T. Spikes 372091_
Name of Plaintiff's Attorney

_P.O.Box 23828_
Address

_L'Enfant Plaza Sw DC 20026_

_202-288-4175_
Telephone

Clerk of the Court

By _____
                    Deputy Clerk

Date  _03/05/2012_

如果您需要翻译,请打电话 (202) 879-4828    Veuillez appeler au (202) 879-4828 pour une traduction    Để có một bài dịch, hãy gọi (202) 879-4828
번역을 원하시면, (202) 879-4828로 전화하십시오     የአማርኛ ትርጉም ከፈለጉ (202) 879-4828 ይደውሉ

IMPORTANT: IF YOU FAIL TO FILE AN ANSWER WITHIN THE TIME STATED ABOVE, OR IF, AFTER YOU ANSWER, YOU FAIL TO APPEAR AT ANY TIME THE COURT NOTIFIES YOU TO DO SO, A JUDGMENT BY DEFAULT MAY BE ENTERED AGAINST YOU FOR THE MONEY DAMAGES OR OTHER RELIEF DEMANDED IN THE COMPLAINT. IF THIS OCCURS, YOUR WAGES MAY BE ATTACHED OR WITHHELD OR PERSONAL PROPERTY OR REAL ESTATE YOU OWN MAY BE TAKEN AND SOLD TO PAY THE JUDGMENT. IF YOU INTEND TO OPPOSE THIS ACTION, _DO NOT FAIL TO ANSWER WITHIN THE REQUIRED TIME._

If you wish to talk to a lawyer and feel that you cannot afford to pay a fee to a lawyer, promptly contact one of the offices of the Legal Aid Society (202-628-1161) or the Neighborhood Legal Services (202-269-5100) for help or come to Suite 5000 at 500 Indiana Avenue, N.W., for more information concerning places where you may ask for such help.

See reverse side for Spanish translation
Vea al dorso la traducción al español

FORM SUMMONS – Oct. 2011                                                            CASUM.doc

SUPERIOR COURT FOR THE DISTRICT OF COLUMBIA
CIVIL DIVISION

RECEIVED
Civil Clerk's Office
MAR 0 5 2012
Superior Court of the
District of Columbia
Washington, D.C.

ANDREA CANNON
12400 Fort Washington, Road
Fort Washington, Maryland 20744

        Plaintiff,

Vs.

WELLS FARGO, BANK N. A
And; WELLS FARGO Insurance Corporation
P.O. Box 8129
Jacksonville, Florida 32239-0129


QBE SPECIALTY INSURANCE CORPORATION
And Sterling Insurance Agency, Inc.
(n/k/a/ QBE First Insurance Agency, Inc.
210 Interstate North Parkway
Atlanta Georgia 30339

        Defendants

Case# **0002101-12**

Plaintiff demands a trial by jury

Nature of the case: Unfair
Deceptive Trade Practice
DC Code Sec. 28-3904
Violations of the Truth In
Lending Act; 15 U.S.C 1601
Fraud and DC Consumer
Protection Act (CPPA) Sec.28-
3091
Force Placed Insurance

Plaintiff seeks Class Acton
Status

## COMPLAINT

### PLAINTIFF FIRST-ORIGINAL- COMPLAINT

    A. Plaintiff, Andre  Cannon, brings this cause of action as an individual

and on behalf of others similarly situated in the District of Columbia. The action is

brought against Wells Fargo, National Association and Affiliate Insurance

Corporation; namely Wells Fargo Insurance Corporation; collectively herein , (Wells

Fargo) , because at all times herein the affiliate, Wells Fargo Insurance Corporation

was acting as an Agent or an Agency of the principal, Wells Fargo, N.A.. This action

is also brought against QBE SPECALITY INSURANCE CORMPANY and Sterling

1

National Insurance Agency, Inc. (n/k/a QBE FIRST Insurance Agency) herein collectively as (QBE First) in that QBE Specialty Insurance Company and Sterling National Insurance Agency are Agencies or Agents of QBE FIRST as QBE FIRST being the Principal. The Doctrine of Respondeate Superior is invoked herein as to the Agent and Agency Relationship among the Defendants.

OPERATIVE FACTS

B. Plaintiff seeks to bring a punitive class-law suit involving Lender's Force-Place Insurance Policies upon Plaintiff-homeowner's property which was insured without a lapse in coverage at the time of the force-placed insurance policy.

C. Defendants are contracting a regular course of business in the District of Columbia as to consumer credit and financing within the meaning and purview of D.C Consumer Protection Procedure Act D.C. Code Sec. 28-3901, which provide procedures and remedies for D.C Consumers, and D.C. Code Sec.28-3904 in that Defendants engaged in deceptive and unfair trade practices; and Defendants' violated Regulation Z and other provisions of the Truth In Lending Act 15 U.S.C. Sec 1601 (TILA) in that they failed to disclose to the D.C., Consumers material facts relative to Lender's Forced Placed Insurance Policies.

INTRODUCTION

D. This is a law suit seeking class action certification, here (class action and Class Members). The primary issue is NOT whether Defendant retained the right to force place collateral protection insurance coverage upon

2

Homeowners where the homeowner's voluntary coverage had lapsed?  If it were, the answer is yes, per the mortgage contract agreement. The  issues are whether Defendants were authorized to force place collateral insurance (1) at an excessive non-competitive rate; (2) with kickbacks disguised as commissions;(3) conceal the cost from Consumers;(4) deceived consumers by manipulating the premiums and ; (5) passing the excessive non-competitive premium cost to the consumer without consideration to consumers and in violation of the expressed and implied terms of the Mortgage Contract and the implied covenant of fairness and fair dealing?

1. The Class action is filed to redress injuries that Plaintiff and other residents and citizens of the District of Columbia suffered as homeowners and consumers as a direct and proximate result of Defendants' unlawful practices, customs, policies and procedures in obtaining Lender's Forced Placed Insurance Policies at an excessive premium cost at the expense of the Class Members and Plaintiff whether the voluntary coverage had or had not lapsed. Defendants' perpetration of the custom, policy and practice are systematic and willful, malicious, fraudulent and without regards for the financial wellbeing of the affected Plaintiff and Class Member.

## WELLS FARGO-DEFENDANT

2. Defendant, Wells Fargo Bank, N.A. (Wells Fargo) is a national bank registered to do business in the District of Columbia with its principal address in San Francisco, California. As a result of a 2004 merger, Wells Fargo Bank is the

3

successor to Wells Fargo Home Mortgage, Inc., which no longer exists. Wells Fargo Banks sometimes does business under the name Wells Fargo Home Mortgage. It is Wells Fargo Bank's practice, when it acquires another bank or lender, to become the successor in interest or assign of the bank or lender's home mortgages.  For example,  on December 29, 2007 Andrea Cannon, Plaintiff  herein, entered into a contract- Deed of Trust- with Wachovia Bank, National Association, relative to real property located at 1235 Queen Street NE Washington, DC 20002, with the Deed Instrument stating that Plaintiff owed Wachovia , $307,665.50 with said property as collateral. When Wells Fargo acquired Wachovia, as successor in interest, it acquired the Deed of Trust with all the contractual obligations contained therein.  *Plaintiff's mortgage is owned and served by Defendant Wells Fargo.*

WELLS FARGO INSURANCE INC.-DEFENDANT

3. Defendant, Wells Fargo Insurance, Inc. ("Wells Fargo Insurance") is a division of Wells Fargo, N.A registered to do business in the District of Columbia with its principal address in Minnesota. Wells Fargo Insurance is a captive insurance agent and primarily an instrumentality of Wells Fargo Bank.

4. As a captive insurance agent for Wells Fargo, upon information and belief, Wells Fargo Insurance does nothing to assist in obtaining the force-place insurance policy and exists only so that Wells Fargo can collect kickbacks or commissions related to the force-placed insurance policies. Wells Fargo Bank and Wells Fargo Insurance may be collectively referred as "Wells Fargo."

4

DEFENDANT

5. QBE SPECIALTY INSURANCE CO, ("QBE SPECIALTY"), is a surplus line insurance provider doing business through Wells Fargo and independently in the District of Columbia.

DEFENDANT

6. Defendant, STERLING NATIONAL INSURANCE AGENCY, INC. (n/k/a QBE First insurance agency, Inc.) ("QBE First), is a managing general agent/ surplus-line insurance broker doing business in the District of Columbia through Wells Fargo. Upon information and belief, QBE First does nothing to assist in finding the force-placed insurance policy and exist only to provide kickbacks and /or collect excessive commissions related to the force-placed policies. As stated supra, Defendant QBE Specialty and QBE First are referred to herein collectively as ("QBE FIRST").

JURISDICTION AND VENUE

7. The Class Action Fairness Act of 2005 (CAFA"), Pub. L. No. 1090-2,119.4 (codified in various sections of 28 U.S.C.), requires that this action be brought before this Court –D.C Superior Court.

8. This Court has jurisdiction over Defendants because they are either foreign corporations authorized to conduct business, are doing business in the District of Columbia and have registered with the District of Columbia

5

Department of Regulatory Affairs, or they do sufficient business, and have sufficient minimum contacts with the District of Columbia, or otherwise intentionally avail themselves of the District of Columbia market through promotion, marketing, sales, and service of mortgage or other lending serviced and insurance policies in the District of Columbia. Accordingly, this purposeful availment renders the exercise of jurisdiction by this Court over Defendants and their affiliated or related entities permissible under traditional notion of fair play and substantial justice.

9. This Court has subject matter jurisdiction pursuant to D.C. Code Sec 11-921(a). The Class Members; The Class Members are District of Columbia residents; Defendants' business transactions come within the purview of D.C Code Sec. 28-3901 of the District of Columbia Consumer Protection Act; and 28-3904, D.C Consumer Protection Procedures Act-Unlawful Trade Practices Provisions in that Defendants' engaged in deceptive trade practices in violation of Sec. 28-3904 (e ) and (f) by making intentional misrepresentations of material facts and failing to state material facts which was designed to mislead DC Consumers and tended to mislead D.C Consumers and Sec, 28-309 (3) (k) (1) (B) provisions for the award of attorney fees and (C ) punitive damages.

## FACTUAL ALLEGATIONS

10. Wells Fargo provides services including but not limited to banking, insurance, investments, mortgage, and consumer and commercial finance

6

across North America. It services over 70 million consumers and entities, and has assets of $1.2 trillion.

11. One of many services provided by Wells Fargo is providing and servicing real property mortgages.

12.   The mortgages at issue in this litigation which are owned and/or serviced by Wells Fargo, requires borrowers, including Plaintiff, to maintain insurance on their real property. If the bowwow fails to maintain the requisite insurance, or allow the voluntary insurance to lapse, the mortgage servicer may forcefully place insurance on the property. Such is explained in the Deed of Trust at Paragraph Five (5) under ("Insurance.") Therefore, Plaintiff is not contending that Defendant does not have the right to force place insurance to protect its collateral; it may do so only in the absence of no coverage or when the homeowner's voluntary coverage has lapsed; Supra( Introduction) (D)).

13. Relative to the mortgage contract - Deed of Trust- at issue- Plaintiff, at all times, maintained voluntary insurance on the Property. She met the required conditions of coverage contained in the contract. Therefore, Defendants was not authorized, expressly or impliedly, to obtain Lender's Force Placed Insurance Coverage on Plaintiff's property.

### PROOF OF COVERAGE VERIFIED BY PLAINTIFF'S INSURANCE AGENT. INSURANCE COVERAGE BY PROPERTY OWNER

14.  Property address: 1235 Queen Street, N.E., Washington, DC 2002 has been and remains insured. There has been no lapse in the insurance coverage: *Coverage provided by*:

7

(a)     Great American Insurance Corporation number: PAC 6145698; July 16, 2008 to current date February 16, 2012.

(b)     Scottsdale Insurance Company. Policy number: CLS 1109861; July 16, 2005 to July 16, 2008.

(c)     The mortgage clause listed on the insurance policy is as follows:

(Wells Fargo NA ISAOA P.O. Box 8129 Jacksonville, Fla. 32239-0129

Loan Number 6806812071480001); See Exhibit#1. Dated 02/16/2012

From Old Dominion Insurance Agency.

## HOMEOWNERS INSURANCE OFFERED BY LENDER
## WELLS FARGO BANK, N.A.
### Letter dated 08/01/11 and 08/31/11 and 01/10/12 and 02/09/12

15. As to the Queen Street property, (The Property herein) Wells Fargo, allegedly sent a letter to Plaintiff; in relevant parts, stated: *"You may qualify for a unique homeowners insurance program through Wells Fargo Insurance, Inc."* See Exhibit#2, letter from Wells Fargo dated 08/01/11. See the identical letters from Defendant to Plaintiff which are dated 08/31/11. See Exhibit #3: 01/10/12, Exhibit#4; and 02/09/12, Exhibit #5.

## WELLS FARGO NOTICE TO PLAINTIFF OF TEMPORARY HAZARD INSURANCE
### BY LETTERS DATED 08/31/11 AND 02/09/12

20.  By letter dated 08/31/11 Defendant wrote, in relevant parts,

*"Previously we wrote to inform you that we did not have evidence of homeowners/hazard insurance coverage to protect your property per the terms of your Mortgage Deed (or Deed of Trust)....This insurance is provided by QBE*

8

*Insurance Corporation. The binder cannot be renewed.*" See Exhibit#6; Dated 08/31/11; "Insurance Effective Date 07/16/11" and an identical letter from Defendant Wells Fargo dated 02/09/12;"*Insurance Effective Date 07/16/11*"

### NOTIFICATION DATE OF INSURANCE AND PREMIUM FROM DEFENDANT WELLS FARGO TO PLAINTIFF DATED 02/09/12:90-Binder $3,064.32

20.  By documentation dated 02/09/12 Defendant Wells Fargo issued Plaintiff a 90-Day Binder with coverage of $319,200 at a premium of $3,064.32 with Policy Terms from 07/16/11/ to 07/16/12. See Exhibit#8.

### RETROACTIVE APPLICATION OF THE COVERGE

21. The "90-DAY BINDER" contains a NOTIFICATION DATE: 02/09/12"

The "POLICY TERM; FROM 07/16/11" These facts indicate that the coverage preceded the notification date by seven (7) months. Notice of the Premium was revealed seven months after the alleged effective date of the coverage.

### PLAINTIFF'S VOLUNTARY COVERAGE FROM 07/16/2011 TO 07/16/2012; ANNUAL PREMIUM: TOTAL $5,770;Collateral  Coverage $319.200

22. For the period of 07/16/2011 to 07/16/2012 Plaintiff maintained voluntary coverage at an annual premium of $5,770 for coverage in the amount of $319,200. See Exhibit# 9; See Great American Insurance Group for premium; Plaintiff's Exhibit #9-A for amount of coverage.

### NANLYSIS AS TO PREMIUMS

9

23. Defendant, Wells Fargo's 90 –day premium, cost Plaintiff $3,064.32 for

coverage of $319,200.  With there being four quarters in one year, the

annual premium would be $12,257.28. For the same amount of coverage,

Plaintiff's voluntary insurance premium was and remains heretofore, for the

same period of time, $5,770. Defendant's Annual premium for the Lender's

Forced Placed Collateral Insurance Coverage is $6487.20 more than

Plaintiff's voluntary coverage; twice as much.

<u>TERMS OF THE MORTGAGE CONTRACT</u>
<u>REQUIREMENT TO MAINTAIN INSURANCE</u>
<u>See Exhibit #10, Deed of Trust Contract</u>

24. In relevant parts, the mortgage contract between Plaintiff and Defendant

Wells Fargo states:

**<u>RELEVANT TERMS OF THE DEED OF TRUST AGREEMENT</u>**

" *Trustor shall keep the improved now improved existing or hereafter erected on the Property insurance against loss by fire, hazard included within the term extended coverage…for which lender requires insurance… All such property insurance shall be maintained in the amount (including deductible levels) and for the period the lender required. What the lender requires pursuant to the insurance shall be by the trustor subject to the lender's right to disapprove trustor's choice, which shall not be exercised unreasonably. If trustor fails to maintain any of the coverage above, Lender may obtain coverage, at Lender's option and borrower's expense. Lender is under no obligation to purchase any particular type of amount of coverage. Therefore, such coverage shall cover Lender, but might or might not protect Trustor, Trustor's equity in the Property, or the contents of the Property, against any risk, hazard of liability and might provide greater or less coverage than was previously in effect. Borrower acknowledges that the cost of the insurance coverage so obtained might significantly exceed the cost of insurance that Trustor could have obtained. Any amounts disbursed by Lender under this Section 5 shall become additional debt of the Borrower by this Secured Instrument. These amounts shall bear interest at the rate applicable to the  Debt Instrument from time to time, from the date of disbursement and shall be payable, with such interest, upon notice from Lender to Borrower requiring payment.*"

10

25. As clearly demonstrated, Defendant obtained unnecessary, unauthorized duplicative insurance and forced the same on Plaintiff's Property and charged Plaintiff with the full cost of the premium.

26. *The premium(s) are not the actual amount that Wells Fargo pays, because a substantial portion of the premiums are refunded to Wells Fargo through various kickbacks and/ or commissions or kickbacks disguised as commissions.*

<u>EXCESSIVE PREMIUMS</u>

27. The premium, as to the Plaintiff's property, was excessive, twice the amount of Plaintiff's then and now existing voluntary coverage. There was no competitive bidding for the premium. Defendants' advertisement represents competitive premium rates. Defendants' advertisement is false, deceptive and misleading. See sec. 28-3904 (i) (j) ( k) (L).

28. In accomplishing this force placement, Wells Fargo, in bad faith and ill will, entered into an exclusive arrangement with QBE FIRST to be the sole insurance provider for all forced placed policies. Under this arrangement the Defendants charge exorbitant rates to Plaintiff(s) and the Class Member who have no way of refusing the force-placed charges.  As stated, these premium charge(s) or rate(s) were not arrived at a competitive basis and were well in excess of those which could have been retained in the open market by Wells Fargo, Plaintiff and the Class Members.  Accordingly, no good faith arm-length transaction is taking place as to the obtainment of the rates and the knowing obtainment of unnecessary duplicative insurance coverage; such is

11

unconscionable under Sec. 28-309 ( r ) and  Plaintiff was not presented with a contract which she could sign for the unlawful unilateral insurance imposition, in violation of Sec .28-309 (q) .

29. In instances where the homeowner's coverage had lapsed, there are cases in which Defendant obtained coverage at an excessive premium that was nine times the cost of either the homeowner's lapsed policy or nine times more than the homeowner existing voluntary policy. Even where the homeowners' policy has lapsed, Defendants, instead of renewing the lapse policy with the homeowners' previous carrier at the previous competitive premium rate, Defendants obtain the excessive premium rate outside of the insurance competitive market place. Plaintiff is contends that this is Defendants' practices as to uninsured D.C. Class Members.

30. The force-placed insurance policies are extremely lucrative for the insurance providers and generate extremely high profit margins estimated in the billions annually.

31. Wells Fargo and QBE FIRST have reaped significant profits relating to the force-placed insurance.

### KICKBACKS FROM QBE FIRST TO WELLS FARGO

32. Wells Fargo receives kickbacks disguised as commissions from the force-placed companies or the insurance brokers or agents once one of the high-priced, force-placed, insurance policies is purchased. These kickbacks are directly tied to the cost of the force-placed insurance. The kickback(s) is a percentage of the total cost of the policy. The total cost of the policy is paid by Plaintiff-Class Members.

12

33. This arrangement provides the mortgage server with an incentive to purchase the highest price force-placed insurance policy on a non-competitive basis that it can- the higher the cost of the insurance policy, the higher their kickbacks disguised as commission. Ultimately, the consumer pays the bill.

34. The commission-kickbacks- is paid by QBE to Wells Fargo in order to maintain their-pre-existing uncompetitive and exclusive relationship, to induce Wells Fargo to purchase excessively -priced force-placed insurance policies, and to cause Wells Fargo to not seek competitive bids in the market.

<u>EXAMPLE OF FRAULENT DEALINGS AND KICKBACKS</u>

<u>REPETITION FOR DEVELOPMENT AND CLARITY OF SPECIFIC FACT RELATIVE TO ALLEGATIONS OF FRAUD'S SPECIFICITY REQUIREMENTS OF Rule 9 D.C AND FEDEERAL RULES OF CIVIL PROCDURE</u>

35. In the instance case, Defendant Wells Fargo wrote to Plaintiff a standard Boiler plated letter, which states in relevant parts:

"Previously we wrote to inform you that we did not have evidence of homeowners/ hazard insurance coverage to protect your property per the terms of your Mortgage Deed...Therefore, Wells Fargo Bank, N.A has secured temporary coverage in the form of a binder, effective as of the date shown above. This insurance is provided by QBE FIRST Insurance Corporation, This binder cannot be renewed. The insurance we obtain will be arranged by Wells Fargo Insurance, Inc., a licensed insurance agency and an affiliate of Wells Fargo Bank, N.A. Wells Fargo Insurance, Inc. will receive a commission on the insurance we obtain. Wells Fargo Bank is not affiliated with the insurance company.  See Plaintiff Exhibit #6 dated 07/16/11.

36. Although 07/16/11 is the "Insurance Effective Date" there is absolutely no information provided as to the premium for the coverage and no binder was presented. Notification date of the coverage is dated 02/09/12. The Binder provides (90-DAY BINDER) with the policy terms from 07/16/11 to 07/16/12 at a premium of $3,064.32. The premium cost was in effect for seven months before

13

Plaintiff was informed of it. Therefore, seven months of coverage is automatically charged to Plaintiff. Plaintiff had no means to reject the premium and Wells Fargo automatically received a kickback-from the unnecessary Lender's Forced-Placed Coverage.  See Plaintiff's Exhibit #8. This is a well though-out scheme which is designed to defraud the Homeowners, who, for the most part, may never come to understand that they have been defrauded.

37. The Defendants have entered into an agreement such that a competitively priced insurance policy is not actually found for any given property. Therefore, the notion that any "commission" is due to either Wells Fargo Insurance or QBE First is false. Rather, the Defendants have a pre-set arrangement by which QBE FIRST has access to and search Wells Fargo's database to find lapsed insurance policies.

36 (A) When QBE FIRST's search of the data base reveals that the Homeowner actually has voluntary coverage, QBE FIRST will often conceal the coverage, hide the coverage and or act as if the coverage does not exist, and obtain Lender's Forced Coverage, as QBE FIRST did in the instant case and in another specific case known to Plaintiff.  When QBE FIRST writes the Homeowners to notify them of the force placed coverage, often the effected date of the coverage and the excessive premium, predate the notice by seven months, as herein demonstrated. At the time of notification of the forced coverage, the homeowner is locked into sever months of excessive premium. This is so, even though The Notification represents 90-day Binder and represents, " This Binder cannot be Renewed." Whether there is or is not a lapse in the homeowner's voluntary coverage, through the Defendants schemes and arrangements, the cost of the insurance is automatically and systematically predetermined without competitive bidding. For

14

example, Defendant, Wells Fargo's letter of 02/09/12, Exhibit #4; and Exhibit#5,

Dated02/09/12 which in relevant parts state:

"You may qualify for a unique homeowner's insurance offer through Wells Fargo Insurance, Inc. .Call our toll-free number 1-866-445-8407 to see if you qualify. You will receive a no-obligation quote within minutes that may even save you money. You may be eligible for: .*Quotes from multiple insurance companies*. Improved coverage compared to your current homeowners or property insurance. Discounts for smoke alarms, security systems and recently constructed homes."

See Plaintiff's Exhibit #4 and #5, with the phrase "YOUR CURRENT HOMEOWNERS

OR PEOPERTY INSURANCE," indicates that Defendant, Wells Fargo had knowledge

of Plaintiff's existing coverage. The representation of competitive quotes from

multiple insurance companies is intentionally false; Plaintiff was never presented

with any quoted or suggested premium for any coverage. Exhibit # 8 represents

the only priced coverage received by Plaintiff.

As stated supra, the unnecessary Forced Coverage upon Plaintiff's property has no

relationship to Plaintiff's property. The cost of the forced Placed Insurance is twice

the cost of Plaintiff's voluntary Insurance Coverage on the property. In other

instances, Defendant placed forced coverage at a premium of nine times more that

Plaintiff's voluntary coverage on property owned by Plaintiff.

### WELLS FARGO'S  DETABASE  REVEALS  ALL NECESSARY INFORMATION AS TO THE PRESENCE OR ABSENCE OF LAPSED COVERAGE

37.The arrangement and the agreement between Wells Fargo and QBE FIRST under

which QBE FIRST has access to and searches Wells Fargo's database to find lapsed

insurance policies, the same database contains homeowner's existing voluntary

insurance policies. The database also contains the phone numbers and addresses of

the homeowners for immediate phone contact. Upon information and belief, the

database also contains the names of the homeowner's insurance agents, the issuer

of the coverage and their respective phone numbers and addresses and the amount

of said coverage alone with the premium cost and the extent of the coverage.

38.    Therefore, Wells Fargo is not just paying QBE FIRST for force-placed

insurance, rather it is paying QBE FIRST to (1) Intentionally ignore and  conceal

the existence of homeowner's voluntary coverage so that Forced Coverage can be

placed on the homeowner's property at homeowner's expense;(2) for that service,

Defendant Wells Fargo pays QBE FIRST a kickback; (3) further, Wells Fargo pays

QBE FIRST for a bundle of services including performing Wells Fargo's job of

administering and servicing the mortgages (4) monitor Wells Fargo's entire

portfolio for not only lapses in coverage, but concealing voluntary coverage's so

that the Wells Fargo Collateral in the Property can take on the character of

uninsured for the imposition of forced-collateral insurance coverage,(5) notify the

Homeowner of the availability of coverage through deceptive advertisement of

competitive rates, irrespective of whether the collateral is insured or not insured,

(6) and force-placing insurance on the collateral with full knowledge that the

collateral is insured by the Homeowner. Once the unnecessary or otherwise

excessive cost for the coverage is in place and placed in a bundle, QBE FIRST

provides administrative services which includes Wells Fargo's cost of monitoring

and services it entire portfolio of loans. Cost for this service to the Homeowner-

Plaintiff, is illegal because, inter alia, *Plaintiff received absolutely no benefit for the*

*services. Defendants acted* in violation of Sec. 28-309 (r-2) because Plaintiff's

property was already insured and that there was no way she could receive either

16

slight or substantial benefit from duplicative coverage. The services are not chargeable to the homeowner under the mortgages because the mortgage contract contains no provisions for the charges and they are illegal.

39.   The arrangement between Wells Fargo and QBE FIRST designates QBE FIRST as the only entity providing the insurance, with Wells Fargo signing off on the Lender's Forced-Placed Coverage with or without actual knowledge of the Homeowners' voluntary existing coverage, with the specific intent of collecting kickbacks disguised as commission, with the entire cost of the transaction charged to Plaintiff and Class Members.

### CAN THE HOMEOWNER AFFORD THE EXCESSIVE PREMIUMN?

40. When QBE FIRST reviews the Homeowner mortgage information contained in the Homeowner's file, they are privileged to review the Homeowner's entire profile to determine whether the Homeowner is in financial distress. The assumption of financial insufficiency follows an uninsured homeowner.

41. Concealment of the premium: If Defendants believes that the Homeowner cannot afford the premium; the premium is scrumptiously attached to the monthly mortgage payments in small increments so as to not alarm the homeowner of the actual premium cost. Or, Defendants will attach the cost of the premium to the principal of the mortgage or alternate the payments between the principal and the monthly payment. This practice misleads the homeowner as to the amount attributed to the principal and interest on the mortgage. Such is the case with Plaintiff in another matter. This is a violation of the Truth In Lending Act's (TILC) disclosure requirement and nearly every aspect of Sec. 28-3904.

17

42. <u>BAD FAITH AND UNCONSCIONABLE PRACTICES</u>  :  At all times herein, Defendants understood that their custom, practice and systematic pattern of (1) obtaining Lender's Forced Placed Insurance Coverage on Homeowner's property that had already been and remained secured by Voluntary Homeowner Coverage to the benefit of mortgage holder; (2) obtaining coverage at an excessive premium for uninsured homeowners; (3) not seeking competitive bids for the premium (4) falsifying its advertisement in stating that the homeowner "may  qualify for a unique homeowners insurance program ..(With) quotes from multiple insurance companies," but not providing the promised competitive rates when Force-Placing the unnecessary coverage upon Plaintiff and the Class Members.  These practices, customs and patterns of illegal acts were perpetrated by Defendants to maximize their profit and kickbacks at the expense and at the cost of the Plaintiff and the Class Members.

## BANKING BUSINESS PRACTICES AND ACTIVITIES

43. <u>Rights of Wells Fargo</u> under the Mortgage Contract to obtained Lenders Force-Placed Insurance to secure its uninsured collateral are not challenged herein nor is its rights to contract with other entities. Therefore, the claims contained in the complaint do not interfere with the exercise of Wells Fargo banking authorities and rights. Nothing herein conflicts with applicable rules of the National Bank Act (NBA) or those of the Office of the Comptroller of the Currency (OCC).

44. <u>Manipulation:</u>  Defendants' manipulated the Lenders Forced Placed Insurance coverage and premium to maximize their profit to the financial detriment of Plaintiff and Class Members. Such practices are not preempted

18

by any Federal Law, Statute or Regulations and are not condones or permissible by the same.

45. Action not authorized by the Mortgage Agreement ( Deed of Trust Contract:

The mortgage contract does not authorize Defendants to obtain Lenders' Forced Collateral Coverage when voluntary coverage exists on the collateral. Federal and State Laws do not authorize Defendants to obtain Lenders' Forced Placed insurance at an excessive premium rate twice or nine times higher than the open market rate or the existing or previous rate of the homeowner's lapsed coverage; Neither does the Federal or State Laws or relative statutory provisions , including the Supermen Court ruling relative to the administration of National Banks, authorize Defendants  to manipulate the provision of a mortgage Contract  and or breach the provisions of the Mortgage contract for profit at the financial detriment of Plaintiff and the Class Members.

46. CONTRIBUTION TO FORECLOSURE: The manipulations by Defendants contribute to foreclosure of many of the properties on which Defendant Wells Fargo holds a mortgage.  The imposition of Unnecessary and fraudulent forced placed insurance premiums upon financially stress struggling homeowner has the potential to demobilize a homeowner's ability to think protectively and defensively. This is well known to Defendants and the same has become part of their strategy in taking advantage of financially stressed homeowners and Class Members.

19

## CLASS ALLEGATIONS

A. Class Definition:

47. Plaintiff brings this action against Defendants pursuant to Rule 23 of the

Federal Rules of Civil Procedure on behalf of herself and all other persons

similarly situated. Plaintiff seeks to represent the following class:

> All individuals, who, within the applicable statute of limitation, were charged for force-placed insurance policy procured through Defendants at an excessive premium whether the homeowners' policy had or had not lapsed. Excluded from the class are Defendants, their affiliates, subsidiaries, agents, board members, directors, officers and/or employees.

48. Plaintiff reserves the right to modify or amend the definition of the proposed

Class before the Court determines whether certification is appropriate.

49. Defendants subjected Plaintiff and the respective Class Members to the same

unfair, unlawful, and deceptive practices and harmed them in the same

manner. The conduct described above is the Defendants' standard, custom,

pattern and undisputed business practices.

B. NUMEROSITY

50. The individual class members are so numerous that joinder of all members is

impracticable. The Defendants sell and service hundreds of thousands, if not

millions, of mortgage loans and insurance policies in the District of Columbia

and nation-wide. The individual class members are ascertainable as the

names and address of all class members can be identified in the business

records maintained by the Defendants. The precise number of class members

20

is certainly more than a thousand and can only be obtained through discovery, but the numbers are clearly more than can be consolidated in one complaint and impractical for each to bring suit individually. Plaintiff do not anticipate any difficulties in the management of the action as a class action.

C. Commonality

51. There are questions of law and fact that are common to Plaintiff and Class Members' claims. These common questions predominate over any questions that go particularly to any individual member of the Class. Among such questions of law and fact are the following:

a. Whether Wells Fargo breached the mortgage contract with Plaintiff and the Class by failing to seek competitive bids on the open market or attempting to continue to reestablish the prior existing policies. (NOTE.) *Plaintiff concedes that her specific claims are premised on the obtainment of force-placed coverage on collateral that maintained voluntary coverage-with no lapse in said coverage.*

b. Whether the premiums charges for force placed insurance were derived from a non-competitive process;

c. Whether Defendants have unlawfully  unjustly enriched themselves at the expense of the Plaintiff and the Class;

d. Weather Wells Fargo breached the implied covenant of good faith and fair dealing by entering into an arrangement with QBE FIRST which resulted in their charging Plaintiff and Class Members excessive amounts of force-placed insurance premiums.

e. Weather the Defendants manipulated the force placed in order to maximize the profits to themselves to the detriment of Plaintiff and the Class.

f. Whether the provision in the mortgage agreement relating to force-placed insurance is procedurally and substantively unconscionable because it does not contemplate or authorize Defendant to derive hidden financial benefits by force-placing the high cost insurance premiums.

g. Whether the premiums charged are illegal and excessive because they include kickbacks and unwarranted "commissions."

h. Whether the premiums charged are illegal and excessive because they include charges for a bundle of administrative services that QBE provides to Wells Fargo that are not chartable to Plaintiff under the mortgage; and

i. Whether the premiums charged to Plaintiff and the Class were bona fife and reasonable under Federal law and the laws of the District of Columbia.

D. Adequacy of Representation

52. Plaintiff is a member of the Class as Defendants' own records plainly reveal. Plaintiff's claims are typical of the claims of the Class because of the similarity, uniformity, and common purpose of the unlawful conduct of Defendants. Each class member has sustained, and will continue to sustain, damages in the same manner as Plaintiff as a result of Defendants' wrongful conduct.

E. Adequacy of Representation

53. Plaintiff is an adequate representative of the Class and will fairly and adequately protect the interest of the Class. Plaintiff is committed to the vigorous persecution of this action and has retained competent counsel, experienced in litigation of this nature, to represent them. There is no hostility between Plaintiff and unnamed class members. Plaintiff anticipates no difficulty in the management of this litigation as a class action.

F. Requirements of  D.C and Fed. R. Civ. P.  23 (b) (3)

53. The question of law or fact common to Plaintiff's and each Class Member's claim predominate over any questions of law or fact affecting only individual members of the class. All claims by Plaintiff and unnamed class members are based on the force-placed insurance policies that Defendants unlawfully secured and their deceptive and egregious action involved in securing the force-placed policy.

54. Common issues predominate when, as here, liability can be determined on a class wide basis, even where there will be some individualized damages determinations.

55. As a result, when determining whether common questions predominate, courts focus on the liability issue, and if the liability issue is common to the class as is the case at bar, common question will be held to predominate over individual questions.

G. Superiority

56. A class action is superior to individual action in part because of the non-exhaustive factor listed below:

a. Joinder of all class members would create extreme hardship and inconvenience for the affected Homeowners as they reside throughout the District of Columbia;

b. Individual claims by class members are impractical because the cost to pursue individual claims exceed the value of what any one class member has at stake. As a result, individual class members have no interest in prosecuting and controlling separate actions;

c. There are no known individual class members who are interested in individually controlling the prosecution of separate actions;

d. The interests of justice will be served by resolving the common disputes of potential class members in this forum;

e. Individual suits would not be cost effective or economically maintainable as individual actions; and

f. The action is manageable as a class action.

H. Requirements of D.C and Fed. R. Civ.P.23 (b) (1) & (2)

57. Prosecuting separate actions by or against individual class members would create a risk of inconsistent or varying adjudications with respect to individual class members that would establish incompatible standards of conduct for the party opposing the class.

58. Defendants have acted or failed to act in a manner generally applicable to the class, thereby making appropriate final injunctive relief or corresponding declaratory relief with respect to the Class as a whole.

## COUNT ONE CONTINUATION

### BREACH OF IMPLIED COVENANT OF GOOD FAITH DEALING OWED TO PLAINTIFF AND ALL CLASS MEMEBRS (Against Wells Fargo Bank and Wells Fargo Insurance Inc. under the law of agency and as server Mortgage holder) SUED COLLECTIVELY.

69. Defendant, Wells Fargo Bank, N.A. at all times herein was both the server Plaintiff's loan and Wells Fargo Insurance , Inc. acted as the agent of the principal Wells Fargo, Bank, N.A. and they were parties to the Mortgage contract and bound by the terms of the Mortgage Contract with Plaintiff.

### DUTY OF CARE

i. Under the Mortgage Contract, Defendant(s) owed Plaintiff a duty of reasonable care of (1) good faith dealing, fair dealing and fair play (2) strict compliance with the expressed terms of the contract and the spirit of the contract terms, (3) to act reasonably, under the Reasonable clause of the contract which implies mutuality of consideration for both Plaintiff and Defendant for reasonable expectation of performance, (4) to not abuse its discretionary authority under the contract. These duties are either expressed or implied in the contract.

ii.            BREACH OF THE DUTIES OF CARE

Defendant (s) breach the duties of care owed to Plaintiff as well as other duties not yet known by (1) Obtaining Lender's Forced-Placed Insurance on Plaintiff's property with full knowledge of Plaintiff's voluntary insurance coverage and that the force-placed coverage was unnecessary. (2) Concealing from Plaintiff the premium for the

25

coverage for a period of Seven (7) months after the effective date of the duplicative unnecessary coverage.(3) Using it discretion to choose an insurance policy in bad faith and in contravention of the parties reasonable expectation, by purposely selecting exorbitantly-priced force placed insurance policies to maximize their own profit. (4)False representation of a material fact by promising through advertisement to Plaintiff that the insurance coverage was special and that the selection of the insurance coverage would be obtained through competitive bids with an premium cost competitive with the cost of Plaintiff's existing voluntary coverage. (5) Failing to seek competitive bids on the open market and instead contracting to contrive a scheme to defraud Plaintiff and the Class Members whereby the insurance policies are continually purchased through the same companies without seeking a competitive price. (6)Collecting a percentage of whatever premiums are charged to Plaintiff and Class Members and not passing that percentage on to the borrower, thereby creating the incentive to seek the highest-price premium possible. (7) Charging Plaintiff and Class Members a commission, which is nothing more than a kickback to Defendant, when the insurance is prearranged and no commission is due; and with no consideration or value to Plaintiff, whereas herein, the coverage was unnecessary, duplicative and willfully and maliciously obtained and imposed upon Plaintiff with full knowledge of her existing coverage.  (8) Charging Plaintiff for having QBE FIRST perform Wells Fargo's obligation of administering it mortgage portfolio which is not legally chargeable to Plaintiff. (9) Defendant never informed Plaintiff as to how the premium would be paid; that is to say, whether the premium would become part of Plaintiff's mortgage principal, or part of the monthly payments on the mortgage so

26

as to be deducted from that part of the payment which is customarily interest, which in turn would decrease substantially the portion that are customarily paid to the principal. (10) At all times herein, Defendant acted in bad faith and in contravention of Plaintiff's reasonable expectation under the contract terms, in particularly under the term of (reasonable) as expressed in the mortgage contract which implies, inter alia, fair play and good faith dealing. (12) Plaintiff justifiably relied upon the Defendant(s) obligation to act in good faith and to fairly deal with Plaintiff and the Class Members to her financial detriment.

### CAUSATION: DIRECT AND PROXIMATE CAUSE

60. Defendant(s)' breach of the duties of care owned to Plaintiff constituted a breach of implied covenant of good faith and fair dealing as to all class members and Plaintiff. As a direct and proximate result of the aforementioned breaches of the covenant of good faith and fair dealing, Plaintiff and the Class Members suffered damages.

### PRAYER FOR DAMAGES

61. WHEREFORE. Plaintiff, on behalf of herself and similarly situated Class Members, seeks judicial declaration determining that the premium charges to Plaintiff was unnecessary and duplicative because Plaintiff maintained voluntary coverage for the period of the imposition of Lender's Forced-Placed Collateral Coverage and therefore the imposed coverage  violated the covenant of good faith dealing and fair play. Defendant(s) decision to charge Plaintiff with the cost of the force-placed insurance was in bad faith and also a breach of implied covenant of good faith and good faith dealing. Plaintiff was financially, recreationally, mentally and

27

psychologically harmed by Defendant(s)' breach and suffered severe mental and emotional distress. The distress debilitated Plaintiff mentally and physically.

62. WITH ALL THING CONSIDERED, Plaintiff seeks compensatory damages, punitive damages, reasonable attorney fees to the maximum extent allowed by statute and law, in an amount no less than $500,000 against Defendants jointly and severally.

### COUNT TWO
### UNJUST ENRICHMENT AGAINST QBE FIRST AND WELLS FARGO
### JOINTLYAND SEVERALLY AS EACH OTHRS AGENT

63. Plaintiff re-allege and incorporate count one in its entirety as if the same were expressly written herein count two. As to Plaintiff's claim of unjust enrichment, Plaintiff further states the following:

### DUTY OF CARE

64. Defendants QBE FIRST and Wells Fargo owed Plaintiff and the Class a duty to exercise reasonable care. The Duties of reasonable care are enumerated in Count One based on all the facts herein. In addition to those duties of care, Defendants further owed Plaintiff and the Class Members a duty to exercise reasonable care:

(1)To not provide a service that it knew was unnecessary and was duplicative at the expense and detriment of the Plaintiff and the Class Members, without providing any consideration to Plaintiff and the Class for the financial benefits Defendants received. (2) Not to create an arrangement between Wells Fargo

28

and QBE FIRST under which non-competitive force-placed insurances and excessive premiums are obtained at the expense of the Plaintiff and the Class Members in bad faith and imposing the same upon them whether they did or did not maintain voluntary coverage.

65. Under the Agreement, the excessive, non-competitive, duplicative and unnecessary coverage was paid for by the Plaintiff and Class Members. The payments, which were significant, went directly to QBE FIRST. For the exclusive rights to obtain the excessive, unnecessary, high premium insurance coverage, QBE FIRST provided kickbacks to Wells Fargo disguised as commissions.

66. As a result, Plaintiff and the Class Members conferred a financial benefit on Defendants; Defendants have knowledge of the financial benefits; they voluntarily accepted the financial benefits and retained the benefits as their own and used the benefit to further their financial gain through investments and the management of Insurance and Banking Business.

67. Plaintiff received absolutely no consideration for the financial benefits she and the Class Members conferred upon Defendants and as much is known by the Defendants.

68. Defendants owed Plaintiff and the Class Members a duty to not obtain financial considerations directly or indirectly from Plaintiff and the Class Members without conferring consideration to Plaintiff and Class

Members. Defendants breached the duties of care owed to Plaintiff and the Class.

69. Defendant Wells Fargo, with direct and indirect contact with Plaintiff, directly benefited from its wrongful conduct related to the force-placed insurance because it received kickbacks disguised as commissions paid by Plaintiff.

70. QBE FIRST, with direct and indirect contact with Plaintiff, directly benefited from its wrongful conduct related to the force-placed insurance because it received directly illegally obtained payments from Plaintiff without consideration to Plaintiff.

71. Defendants will be unjustly enriched if they are allowed to retain the financial benefits. Plaintiff and each Class Member are entitled to an amount equal to the amount contributed by them to Defendants' unjust enrichment.  At all times herein, Defendants acted in bad faith with ill will and specific intent to defraud Plaintiff and Class Members. Plaintiff justifiably relied on Defendants to act in good faith and to deal with her in a fair and just manner.

72. Defendant, under the mortgage contract, has a right to obtain Forced-Place Coverage upon its collateral when the homeowners' policy has lapsed. The rights of Defendants, in this respect, are not the issue.  The primary issue here of fact is,, Defendants intentionally, willfully, wantonly and knowingly obtained unnecessary, duplicative insurance coverage at a non-competitive rate which resulted in a high ridiculous premium, knowing

that Plaintiff maintained the coverage they were unilaterally imposing upon her without her knowledge, implied or expressed consent, and fraudulently charging Plaintiff with the cost of the premium, for the sole purpose of their mutual financial gain. Beyond unjust enrichment, the practice constitutes theft.

73. Plaintiff could not avoid the Forced-place insurance because:

(1)    She maintained coverage; not like some homeowners who would be deemed to have invited the force-placed covers due to a lapse in their voluntary coverage. (2) She had no opportunity to reject the coverage-premium because the premium postdated the coverage for Seven (7) Months. (3) The premium amount was deceptive in that defendant represented a 90 day coverage at a time when there had already been a seven month coverage which increased the premium cost. (4) Even if Plaintiff had received consideration for the force-placed coverage, the consideration would have been inadequate. (5) Even if the consideration was adequate, the added cost paid directly to Defendants in the farm of kickbacks would disturb the fairness of the entire payment and the transaction per Defendant's agreement and illegal arrangement.  (6) The mortgage contract does not contain provisions for kickbacks and Lender's imposition of duplicative collateral coverage.

## DIRECT AND PROXIMSTE CAUSE- DAMAGES

72. Plaintiff and the Class Members, through monetary payments to
Defendants without considerations or benefit to Plaintiff and Class Members,
they suffered financially, mentally, emotionally and emotional distress. 73.

73. Wherefore, Plaintiff and the Class Members prays for compensation equal
to that which they conferred upon Defendant, with interest and penalties
equal to the same of that which Plaintiff and Class Members would owe
Defendant(s) had they defaulted on a lone with to Defendant(s) including the
sum of late payments, interest and the derivative of investment revenue of
such funds at the highest interest rate possible.   Plaintiff and the Class
Members seek restitution.

<u>COUNT THREE</u>

<u>FRAUDULENT  MATERIAL MISREPRESENTATION  OF MATERIAL FACTS AND
FRAUDULENT CONCEALMENT OF MATERIAL FACTS AND FRAUDULENT OMISSION
OF MATRIAL FACTS AGAINST QBE SPECIALTY INSURANCE COMPANY: AND
STERLING NATIONAL INSURANCE AGENCY, INC.(n/k/a  QBE FIRST INSURANCE
AGENCY, INC.
COLLECTIVELY AS QBE FIRST</u>

74. Plaintiff restates and re-alleges all duties of care owned to Plaintiff as
stated in previous counts as if the same were expressly stated herein count
three and further states:

<u>DUTY OF CARE</u>

Defendant owed Plaintiff a duty to exercise a reasonable duty of care to:

(1)    Not make false misrepresentations of material facts.

(2)    Not make said misrepresentation of material fact with full knowledge that
    they were false.

32

(3)     Not make the false misrepresentation of material fact with the intent to

induce Plaintiff to her detriment upon her reliance on said material

misrepresentation.

(4)     Not to conceal from Plaintiff material facts with the intent to defraud

Plaintiff.


### BREACH OF DUTY OF CARE

(5)     Defendants' acts and omissions , stated as follows ,further constituted a

breach of their (its) duty of care:

(a)     Defendant's search of Wells Fargo's database revealed Plaintiff coverage.

Defendant obtained the force-placed insurance solely for a commission,

illegal payment and kickbacks pursuant to the agreement between

Defendant and Defendant Wells Fargo.

(b)     Defendant, through misleading and false advertisement, in conjunction

with Defendant Wells Fargo, falsely promised Plaintiff that she may qualify

for special insurance at a competitive rate when at all times imposing upon

Plaintiff unnecessary coverage at non-competitive rates without plaintiff

implied or expressed consent.

(c)     Defendant concealed from Plaintiff the cost of the illegal coverage seven (7)

months after the effective date of the excessive premium.

(d)     With actual knowledge that Plaintiff maintained voluntary insurance

coverage, Defendant represented that Plaintiff did not have or maintained

voluntary insurance coverage and used the false representation to obtain

33

force –placed insurance on Plaintiff's property and charged Plaintiff with the cost of the insurance.

(6)   Defendant represented that Plaintiff "may qualify for a unique homeowner program offered through Wells Fargo Insurance, Inc....with Quotes from multiple insurance companies" and thereafter, knowingly obtained unnecessary Lender's Force Placed Insurance on Plaintiff's property that was twice the cost of Plaintiff's already voluntary coverage. The coverage was obtained with an excessive premium. The premium was obtained outside of the competitive insurance marketplace.

(7)   All said misrepresentation and omissions and concealments were of material facts and Plaintiff justifiably relied on the same to her financial detriment.

### VIOLATION OF THE DISTRICT OF COLUMBIA CONSUMER PROTECTION LAWS DE CODE SECTION 28-3904

75. District of Columbia Consumer Protection Laws, Section 28-3904, in relevant parts states that it shall be a violation of this chapter, whether or not any consumer is in fact misled, deceived or damaged thereby for any person to:

Misrepresent services (e) misrepresent as a material fact which has tendencies to mislead;

Material Fact: Defendant's advertisement falsely represented competitive premium Cost as stated throughout herein.

(e)   "Fail to state a material fact if such  failure tends to mislead;"

### violations

Material Fact: Defendant's failure to disclose that the premium suggested was

34

Twice the cost of Plaintiffs' current coverage is an omission of a material fact with

the intent to mislead because Defendant was aware of the cost of Plaintiff's

present and then existing coverage.

(h)" Advertise of offer goods or services without the intent to sell them or without
the intent to sell them as advertised or offered;"

### Violations

Material Fact:  Defendant(s)' advertisement promised competitive insurance

premium with the intent to not seek competitive bids for the premium, rather,

obtained a non-competitive premium coverage .

(i)" advertise or offer goods or services without supplying reasonable expected
public demand, unless  the  advertisement or offer disclose a limitation of quantity
or other qualifying conditions which has no tendencies to mislead;"

### Violations

Material Fact of omission:  Defendants' advertisement omitted the premium cost it

knew  would be ultimately charged to Plaintiff and when Plaintiff did not

respond to the advertisement, Defendant illegally obtained the forced placed

insurance at Plaintiff's expense. The public does not demand excessive premium.

(J) "make false  or misrepresentation of fact concerning the reasons for, existence
of, or amounts of price reductions, or the price in comparison to price of
competitors or one's own price at a past or future time;"

### Violations

Material fact: Defendants' advertisement represent that the competitive rates may

be less that Plaintiff's known premium for the same coverage offered by Defendant,

but at all times intended to provide a non-competitive rate twice as much as

Plaintiff's existing coverage as demonstrated and evidenced by the facts.

(K) "falsely state the serviced, replacements , or repairs are needed;"

35

Material Fact:  Defendant(s)' advertisement which indicated that the cost of

coverage may be less than Plaintiff's existing coverage, materially suggested

replacement coverage with the intent of a more expensive premium.

<u>Violations</u>

These facts support a violation of Section (L), (q) below, of the Act (R) (r2) (r3)

(r4) (r5) and (r5.t-r.5.u))

((L)" falsely state the reason for offering or supplying goods or services at sale or

Discounted prices;"

<u>Violations</u>

Defendants actual reasons for offering the coverage was to charge Plaintiff

excessive premium rates rather than the advertised competitive rates whether

Plaintiff did nor did not respond to the advertisement.

(q) failure to supply to a consumer a copy of a sale or service contract...or other
evidence of indebtedness which the consumer may execute;

<u>Violations</u>

The Insurance was Forced Placed against the provisions of the Deed Contract;

therefore voluntary acceptance was required with Plaintiff's consent in writing to

satisfy the statute of frauds. Defendant presented no document for Plaintiff's

signature for acceptance.

(r) make or enforce unconscionable terms or provisions of sale or leases.. with (r.2)
knowledge by the person at the time of the sale or lease of the inability of the
consumer to receive substantial benefits from the property or services sold or
leased;

36

### Violations

Plaintiff's voluntary insured collateral status precluded her from any benefit of duplicative coverage of the collateral at or not at an excessive premium cost;  all of which Defendants were completely aware at all times herein.

(r.3) gross disparity between the price of the property or services sold or leased and the value of the property or services measured by the price at which  similar property or services are recently obtainable in transactions by like buyers or lessees;

### Violations

Defendants' forced placed insurance premium cost was twice that of Plaintiff's existing voluntary coverage for the same period of the coverage. The absence of competitive bidding, notwithstanding the excessive premium, Defendants had an obligation to secure  a rate " recently obtainable in transactions by like " insurance brokers, agency, agents and or carriers. This Defendants intentionally did not do.

(r4) that the person contracted for or received separate charges for insurance with respect to credit sale with the effect of making the sale, considered as a whole, unconscionable;

### Violations

Defendants' obtainment of the Forced placed Insurance, where Plaintiff had existing voluntary coverage sufficient to secure Defendants' collateral interest, and where, as herein, the Defendants' duplicative coverage mirrored Plaintiff's coverage in all material respects except for the cost of the premium; said acts and omission to act constitute unconscionably

 and (r5) that the person has knowingly taken advantage of the inability of the consumer reasonably to protect his interests by reason of age, physical or mental infirmities, ignorance, ...or inability to understand the  language of the agreement, or similar factors;

37

## Violations

IGNORENCE: Defendants scheme is highly sophisticated and strategically administrated with the specific intent to take advantage of the ignorance of the consumer, and they have successfully done so to their billion dollar benefit and to the detriment of Plaintiffs and Class members.   Plaintiff had no way of understanding Defendants' scheme. The discovery of the scheme was by change.

Inability to Understand:  Defendants did not fully disclose the illegal transaction. The non-disclosure and untimely disclosure of both the coverage and the excessive premium are part of the Defendant's scheme.  Defendant(s) perfects the policy and Levy the cost upon Plaintiff and the Class Members before the Class and Plaintiff  become aware of the coverage and the premium.  It is humanly impossible to understand that which one is completely unaware and the same goes to understanding a fragmented scheme designed to deceive.

Mental Infirmities: Defendant, Wells Fargo is well aware of finical conditions relative to Plaintiff and is fully aware that the conditions have  mentally depressed Plaintiff to the extent that she and any reasonable person similarly situated would fall within the category of Mental Infirmity.   With this knowledge, Defendant maliciously and intentionally took advantage of Plaintiff by imposing upon Plaintiff the Forced Placed Duplicative Insurance Coverage with the excessive premium cost. Mental economic depression relative to foreclosure is rapidly resulting in suicides.

(r 5.t) use deceptive representation or...origin in connection with goods or services ;( r.5.u) represent that the subject of a transaction has been supplied in accordance with a previous representation when it has not.

<u>Violations</u>

Defendants' advertisement, in which Defendants reference a competitive price for the insurance premium, constitute previous representation of a reasonable competitive premium for the coverage , were as the obtainment of the coverage was not competitive as to the cost of the premium. This violates (r 5. t).

Violation of (r.5.u): based on Defendants' advertisement of a competitive rate and the subsequent obtainment of the coverage at a non-competitive rate, clearly violate sec. sub, part (r.5.u).

80. Defendant violated each of the cited sections of the DC Consumer Protection Act through the entire aforementioned breaches of the duty of care and the relevant facts contained in the complaint and the same constituted Deceptive Trade Practices in violation of the DC Code Section 28 Sec. 3904.

<u>VIOLATION OF THE TRUTH IN LENDING ACT("TILA")</u>
<u>15 U.S.C. Sec. 1601 et seq.</u>

81. Defendant violated TILA and Regulation Z, 12 C.F.R Sec 226.1 et seq, by failing to disclose the existing cost of the illegally Lender's Forced Place Insurance premium until seven (7) months after the effective date of the application of the coverage as stated in more detail herein. When the premium cost was disclosed, the material fact that it extended beyond the quoted 90 days and as did the premium cost quoted was an omission of a material fact as well as failure to disclose a material fact. Defendants' failure to disclose the terms of payment of the

premium was an omission of a material fact and failure to disclose a material fact, all with the intent to deceive.

82. At all times herein, Defendants intentional acts and omissions were perpetrated under the agreement between Wells Faro and QBE FIRST and said advertisement and material and fraudulent misrepresentation and omission of material facts was issued by Defendant QBE FIRST and Wells Fargo jointly.

### CAUSATION AND DAMAGES

83. Plaintiff relied to her financial detriment on the belief that Defendant would not deceive her or obtain coverage on her property with knowledge of her existing coverage. As direct result of Defendant(s)' breach of the duties of care owned to Plaintiff and said statutory violations and Defendant(s)' acts of deceptive trade practices, Plaintiff has suffered financially and emotionally. Plaintiff prays for Punitive Damages against Defendant QBE FIRST in the amount of $20,000,000 for herself and each Class Member and compensatory damages to be awarded by a jury based on the evidence, and reasonable attorney fees and cost.

### COUNT FOUR

### FRAUDULENT  MISREPRESENTATION OF MATERIAL FACT AND FRAUDLENT CONCEALMENT OF MATERIAL FACTAGAINST FARGO N.A AND WELLS FAGO INSURANCE INC. COLLECTIVELY AS WELLS FARGO

### DUTY OF CARE

84. Plaintiff restates and incorporates  all that is stated and alleged in the entire complaint and specifically restates the allegations, duties of care , statutory violations of DC Code  Section 28-3904 as if Defendant Wells Fargo was in count

40

three for the content of the count applying to Defendant Wells Fargo and further states:

## FACT

85. At all times herein, Defendant had actual knowledge that Plaintiff maintained coverage on the collateral property.

86. Defendant's owed Plaintiff a duty of reasonable care to disclose to Plaintiff all material facts regarding its agreement with QBE FIRST under which QBE FIRST was to obtain unnecessary, duplicative and non-competitive Lender's Forced Placed Insurance coverage for her property which was already insured under the terms of the Mortgage Agreement.   The duty extends to Defendant's obligation to disclose the cost of the premium and the method designated for Plaintiff to pay the cost of the premium.

## BREACH OF THE DUTIES OF CARE

87. Defendant did not make the necessary disclosures and thus breach the duties of care owned to Plaintiff.

88. The breach of the duties constitutes a violation of the aforementioned District of Columbia Deceptive Trade Practices , 28-3904( e )and (f) making misrepresentations and failing to state a material fact which tends to mislead consumers, and Regulation Z of the (TILA) in failing to disclose material facts in a real estate and credit transaction.

89. All of Defendants acts and omissions were intentional, performed with malice and direct disregards for the financial being of Plaintiff and Class Members.

41

Defendant make said misrepresentation with full knowledge that they were false;
Make the false misrepresentation with the intent to induce Plaintiff to her detriment;
Conceal from Plaintiff material facts with the intent to defraud Plaintiff.

## CAUSAION AND DAMAGES

90. Plaintiff justifiably relied on Defendant to not breach the duties of care Defendant owed Plaintiff and as a direct result of Defendant's breach, Plaintiff has suffered , is suffering and shall continue to suffer financially, emotionally, recreationally and socially.

## PRAYER FOR DAMAGES

91. Plaintiff prays for punitive damages against Defendant in the amount of $5,000,000 because Defendant's intentional cats and omissions are outrageous and shocking to the conscious of a sane society. Plaintiff prays for Compensatory damages and reasonable attorney fees and cost and compensation for Class Members.

## COUNT FIVE

## MALICIOUS BREACH OF CONTRACT
## AGAINST WELS FARGO

92. The mortgage agreement between Plaintiff and Defendant ( Deed of Trust) is a contractual agreement. Defendant is both the holder of the Deed of Trust and the server of the same.

## DUTY OF CARE AND PROVISIONS OF THE CONTRACT

93. Paragraph five (5) of the agreement set forth the conditions under which the Lender may force-place collateral protection insurance upon the homeowner, Plaintiff. When the homeowner has existing coverage, the lender is not permitted to Force coverage upon the insured property at the Homeowner- Plaintiff's expense, i.e. charge Plaintiff with the premium, nor is the lender permitted to obtain coverage at a non-competitive price and require Plaintiff to pay for the premium, nor does the contract permit Defendant create an arrangement with QBE FIRST under which QBE FIRST obtain the coverage at an excessive cost, charge the cost to the homeowner, Plaintiff, and provide Defendant with a kickback disguised as a commission, all of which comes from the payments of the excessive premium by Plaintiff.

94. Defendant , who at all times, had actual knowledge, that Plaintiff maintained coverage on the collateral, intentionally and maliciously breach thee expressed and implied terms of the contract by obtaining Lender's forced-coverage  from QBE FIRST with the intent to defraud Plaintiff for a kickback of Plaintiff's premium payments for the duplicative, unnecessary and non–competitive premium. Plaintiff justifiably relied to her detriment on Defendant to honor the terms of the Mortgage Contract.

## DAMAGES

95.     As a direct result of Defendant's breach of contract, Plaintiff suffered financially, emotionally and recreationally. Plaintiff prays for compensatory damages in the amount of $80,000 and Punitive damages for malicious breach of

contract in the amount of $5,000,000, and just compensation for each Class
Member.

## COUNT SIX
### FRAUD AND CONVERSION
#### AGAINST QBE FIRST AND WELLS FARGO JOINTLY AND SEVERALLY
#### UNDER THE LEGAL THEORY OF AGENCY AND THE DOCTRIN OF RESPONDEAT
#### SUPERIOR

96. The arrangement between Defendant Wells Fargo and QBE FIRST, under
which QBE FIRST has access to and searches Wells Fargo's database to fine lapsed
insurance policies, whereas the same search also reveals the existence of non-
lapsed polices; the fact that QBE FIRST advertise the insurance coverage through
Wells Fargo letterhead with false representation of competitive rate, omission of the
cost of the premium, and the fact that , when Wells Fargo represent to the
Homeowner," You may qualify for a unique homeowners insurance program
through Wells Fargo Insurance, Inc.... Quotes from multiple insurance companies,
Discount for smoke alarms"   when at all times referring QBE FIRST as its exclusive

Agent for obtainment of the coverage, and admitting in the advertisement, " Wells
Fargo Insurance, Inc. will receive a commission on the insurance we obtain", bears
all the characterizes and elements of an agency relationship.

44

## AGENCY

97. At all times herein, QBE FIRST was an Agency of an Agent of Defendant Wells Fargo and at all times herein, Defendant Wells Fargo was action as an Agency of an Agent of QBE FIRST.

## DUTY OF CARE

98.  Defendants at all times herein acted jointly and in concert with the malicious and specific intent to Defraud Plaintiff and Class Members of their hard earned money through fraudulent obtainment of Lender's forced placed insurance when it had actual knowledge that the homeowner, Plaintiff herein , maintained coverage, yet they jointly agreed to purchase the duplicative insurance coverage at an excessive premium , charge the premium to Plaintiff and share the premium between themselves and characterize the sharing as a commission. From the transaction, Plaintiff gets absolutely nothing. Defendants, who are not legally entitled to the premium payment provided directly to them by Plaintiff, accepts the money –premium – as their own money and use the money for their individual purpose.

99. All said acts and omissions were material, as stated herein, were performed maliciously, wantonly, intentionally with ill will and the intent to defraud Plaintiff, and the same constitute a breach of the duty of care owned to Plaintiff (not to defraud her), and conversion of Plaintiff's financial payment for the illegally obtained coverage and fraud.

45

## PRAYER FOR DAMAGES

100. As a direct result of Defendants' joint illegal acts, Plaintiff was damaged financially, socially, recreationally and emotionally.

1001.  Plaintiff prays for Punitive damages against Defendants jointly and severally for their fraudulent acts, which are shocking to the conscious of a sane society, in the amount of $5,000,000 and $5,000,000 in compensatory damages and the same relief for each Class Member.

102.  Plaintiff further prays for restitution of the money paid for the duplicative coverage with investment interest, late fees and finance charges at the same rate charged by the Bank-Defendant- under reverse circumstances.

## COUNT SEVEN

## UNCONSONSCIONABILITY AGAINST DEFENDANT WELLS FARGO AND QBE FIRST JOINTLY AND SEVERALLY AS AGENTS OF EACH OTHER

103. Plaintiff restates and incorporates all allegations and facts contained in the entire complaint as if the same were expressly stated herein Count Seven and in support of plaintiff's claim for UNCONSCIONABILITY, which is recognized in the District of Columbia as an Cause of Action under Consumer Protection Procedures Unlawful Trade Practices D.C. Code Section 28-309 (r) (1) (2) (3)and relevant sub parts mentioned herein.

104. Plaintiff's  Mortgage Contract contained no provisions that allowed Defendants to force place Lender's Insurance upon Plaintiff's  Property were maintained voluntary insurance coverage on the collateral property.

46

105. Defendants decision to force place coverage on the already insured property at twice the cost of Plaintiff's identical coverage was not provided by the terms of the Mortgage Contract.

106. The Mortgage Contract did not provide terms under which Defendants were permitted to provide kickback to each other from the money paid to them for insurance of which was absolutely no benefit to Plaintiff.

107. These acts are unconscionable and offend the decadency and the integrity of business practices and every aspect of fairness and fair play in the consumer market place. No reasonable person would agree to the foregoing provisions if they were aware that they were paying much more than the true cost of the insurance policy because a portion, based upon a percentage of the cost, was being paid back to the mortgage server or if they were aware that the Defendants would have an incentive to choose an exorbitantly-priced and /or backdated policy –premium–in order to reap huge profits off of the borrower. Why would Plaintiff accept duplicative – unnecessary coverage at an exorbitance rate? No reasonable person would have accepted these terms and no fair Lender, Insurance broker, agent, agency or company would have perceived these terms as being conscionable.

### DUTY OF CARE

108. Defendant (s) owed Plaintiff a duty to exercise reasonable care to adhere to the terms of the Mortgage Agreement.

## BREACH OF THE DUTY OF CARE

109. Defendant(s) breached the duty of care owed to Plaintiff when they charge Plaintiff for forced placed insurance; and when they performed all intentional acts and omissions to act relative to the obtainment of the Forded Placed Insurance;  all of which were not permitted by the terms of the Mortgage Contract, as explained in detail herein.

## CAUSATION

110. Defendant(s) breach of the duty of care is unconscionable.  Plaintiff was financially and emotionally damaged by Defendant(s)' breach of the duty of care owed to Plaintiff.

111. Wherefore, based on the procedural and substantive of the contract provisions at issue and the absence of the certain provisions, Wells Fargo  and  QBE FIRST should be required to refund an amount to Plaintiff equal to all hidden profits or other financial benefits previously collected from Plaintiff and members of the Class, and rescind all such amounts charges  not yet collected from Plaintiff and Class Members and reasonable attorney fees and cost.

## PRAYER FOR RELIEF

112. WHEREFORE, Plaintiff on behalf of herself and all similarly situated individuals, demand judgment against defendants as follows:

    (1)   Declaring this action to be a proper class action maintainable pursuant
          to Rule 23 declaring Plaintiff as representative of the Class and
          Plaintiff's counsel as Counsel of the Class.

(2)     The conduct alleged herein be declared, adjudicated and decreed to be unlawful.

(3)     Plaintiff and the Class are awarded actual, statutory and punitive damages pursuant to the relevant Federal Laws, Statutes and DC CPPA.

(4)     Preliminary and permanent injunction is issued barring Defendant from obtaining force lenders insurance on those who maintain coverage; order Defendant to fully disclose the cost of the premium under all circumstances and the method of payment of the premiums.

(5)     An order granting Plaintiff and the Class cost of suit, reasonable attorney's fees and expense; and

(6)     An order granting Plaintiff and the Class any other relief available at

(7)     Law or in equity and a Trial by Jury.

<u>VERIFIED COMPLAINT</u>

I, Andrea Cannon, having supplied the facts in the complaint and having read and understood the same as true to the best of my knowledge and recollection, hereby place my signature under the pains and penalties of perjury on this __4__ day of March 2012.

**Plaintiff demand a trial by jury**

Harry T. Spikes, #372091
P.O. Box 23828
L'Enfant Plaza S.W.
Washington, DC 20026
(202) 288-4175

# OLD DOMINION INSURANCE AGENCY

*General Insurance*

BELLE HAVEN PROFESSIONAL BUILDING
1451 BELLE HAVEN RD., SUITE 230
ALEXANDRIA, VA 22307

Tel: (703) 765-7653
(800) 999-8426
Fax: (703) 768-7383

February 16, 2012

**EXHIBIT**
**4**
Cannon V Wells Fargo

Andrea Cannon
12502 Haxall Court
Fort Washington, MD  20744

Dear Mrs. Cannon,

RE:  Property & Liability Insurance
Property Address:  1235 Queen Street, N.E., Washington, DC  20002

The location referenced above is currently insured by Great American Insurance Company for property and liability insurance coverage.  There has been no lapse in insurance coverage.  Please see the following for coverage dates, policy numbers and insurance company name.

Great American Insurance Company, policy number:  PAC6145698
July 16, 2008 to the current date, February 16, 2012

Scottsdale Insurance Company, policy number:  CLS1109861
July 16, 2005 to July 16, 2008

Prior insurance polices are in archives.

The mortgagee clause listed on the insurance policy is as follows:

Wells Fargo Bank NA
ISAOA
PO Box 8129
Jacksonville, FL  32239-0129

Loan Number:  6806801207140001

If the mortgagee clause is incorrect, please contact this office immediately to make the necessary corrections.

In the meantime, if you have any questions, please feel free to contact me.

Sincerely,

*Lynn Thurman*

Lynn R. Thurman

LRT/tas



Wells Fargo Bank NA
P.O. Box 8129
Jacksonville, FL 32239-8129

Wells Fargo Insurance, Inc.
DBA Wells Fargo Insurance Services
Wells Fargo Insurance Agency, Inc.
Wells Fargo Insurance Agency

Date: 08/01/11

Re: Homeowners Insurance                          Lender: WELLS FARGO BANK, N.A.

Property Location:
1235 QUEEN ST NE                          Account No.: 68068012071480001
WASHINGTON DC 20002



Dear Wells Fargo Bank, N.A. Customer:

You may qualify for a unique homeowners insurance program offered through Wells Fargo Insurance, Inc.

Call our toll-free number 1-866-445-8407 to see if you qualify. You will receive a no-obligation quote within minutes that may even save you money. You may be eligible for:

- Quotes from multiple insurance companies
- Improved coverage compared to your current homeowners or property insurance
- Discounts for smoke alarms, security systems and recently constructed homes*

You are under no obligation to call and the insurance company you select will have no effect on your credit with Wells Fargo Bank, N.A..

Please call 1-866-445-8407 today for your free homeowners insurance quote.

Sincerely,

Wells Fargo Insurance, Inc.

* Discounts vary by state.

Wells Fargo Insurance, Inc. and its licensed affiliates are agents and are compensated by the insurer for placing this coverage. Your purchase of insurance through Wells Fargo or any other agent or company will not affect current or future credit decisions in any way.

| Insurance products are available through Wells Fargo Insurance, Inc. or licensed affiliates CA License No. 0831603 | |
|---|---|
| Not insured by FDIC or any federal government agency | Not deposits of or guaranteed by any bank |



**WELLS FARGO**

Wells Fargo Bank NA
P.O. Box 8129
Jacksonville, FL 32239-8129

Wells Fargo Insurance, Inc.
DBA Wells Fargo Insurance Services
Wells Fargo Insurance Agency, Inc.
Wells Fargo Insurance Agency

Date: 08/31/11

Re: Homeowners Insurance                    Lender: WELLS FARGO BANK, N.A.

Property Location:                           Account No.: 68068012071480001
1235 QUEEN ST NE
WASHINGTON DC 20002



Dear Wells Fargo Bank, N.A. Customer:

You may qualify for a unique homeowners insurance program offered through Wells Fargo Insurance, Inc.

Call our toll-free number 1-866-445-8407 to see if you qualify. You will receive a no-obligation quote within minutes that may even save you money. You may be eligible for:

- Quotes from multiple insurance companies
- Improved coverage compared to your current homeowners or property insurance
- Discounts for smoke alarms, security systems and recently constructed homes*

You are under no obligation to call and the insurance company you select will have no effect on your credit with Wells Fargo Bank, N.A..

Please call 1-866-445-8407 today for your free homeowners insurance quote.

Sincerely,


Wells Fargo Insurance, Inc.


* Discounts vary by state.

Wells Fargo Insurance, Inc. and its licensed affiliates are agents and are compensated by the insurer for placing this coverage. Your purchase of insurance through Wells Fargo or any other agent or company will not affect current or future credit decisions in any way.

| Insurance products are available through Wells Fargo Insurance, Inc. or licensed affiliates CA License No. 0831603 ||
|---|---|
| Not insured by FDIC or any federal government agency | Not deposits of or guaranteed by any bank |



**WELLS FARGO**

Wells Fargo Insurance, Inc.
DBA Wells Fargo Insurance Services
Wells Fargo Insurance Agency, Inc.
Wells Fargo Insurance Agency

Wells Fargo Bank NA
P.O. Box 8129
Jacksonville, FL 32239-8129

Date: 01/10/12

**EXHIBIT**
**H**
Conmon v Wells
Fargo

Re: Homeowners Insurance                     Lender: WELLS FARGO BANK, N.A.

Property Location:                             Account No.: 68068012071480001
1235 QUEEN ST NE
WASHINGTON DC 20002

Dear Wells Fargo Bank, N.A. Customer:

You may qualify for a unique homeowners insurance program offered through Wells Fargo Insurance, Inc.

Call our toll-free number **1-866-445-8407** to see if you qualify. You will receive a no-obligation quote within minutes that may even save you money. You may be eligible for:

- Quotes from multiple insurance companies
- Improved coverage compared to your current homeowners or property insurance
- Discounts for smoke alarms, security systems and recently constructed homes*

You are under no obligation to call and the insurance company you select will have no effect on your credit with Wells Fargo Bank, N.A..

Please call **1-866-445-8407** today for your free homeowners insurance quote.

Sincerely,

Wells Fargo Insurance, Inc.

* Discounts vary by state.

Wells Fargo Insurance, Inc. and its licensed affiliates are agents and are compensated by the insurer for placing this coverage. Your purchase of insurance through Wells Fargo or any other agent or company will not affect current or future credit decisions in any way.

| Insurance products are available through | |
|---|---|
| Wells Fargo Insurance, Inc. or licensed affiliates CA License No. 0831603 | |
| Not insured by FDIC or any federal government agency | Not deposits of or guaranteed by any bank |



**WELLS FARGO**

Wells Fargo Bank NA
P.O. Box 8129
Jacksonville, FL 32239-8129

Wells Fargo Insurance, Inc.
DBA Wells Fargo Insurance Services
Wells Fargo Insurance Agency, Inc.
Wells Fargo Insurance Agency

Date: 02/09/12

Re: Homeowners Insurance                Lender: WELLS FARGO BANK, N.A.

Property Location:                       Account No.: 68068012071480001
1235 QUEEN ST NE
WASHINGTON DC 20002



Dear Wells Fargo Bank, N.A. Customer:

You may qualify for a unique homeowners insurance program offered through Wells Fargo Insurance, Inc.

Call our toll-free number 1-866-445-8407 to see if you qualify. You will receive a no-obligation quote within minutes that may even save you money. You may be eligible for:

- Quotes from multiple insurance companies
- Improved coverage compared to your current homeowners or property insurance
- Discounts for smoke alarms, security systems and recently constructed homes*

You are under no obligation to call and the insurance company you select will have no effect on your credit with Wells Fargo Bank, N.A..

Please call 1-866-445-8407 today for your free homeowners insurance quote.

Sincerely,

Wells Fargo Insurance, Inc.

* Discounts vary by state.

Wells Fargo Insurance, Inc. and its licensed affiliates are agents and are compensated by the insurer for placing this coverage. Your purchase of insurance through Wells Fargo or any other agent or company will not affect current or future credit decisions in any way.

| Insurance products are available through | |
|---|---|
| Wells Fargo Insurance, Inc. or licensed affiliates CA License No. 0831603 | |
| Not insured by FDIC or any federal government agency | Not deposits of or guaranteed by any bank |

**WELLS FARGO**

Wells Fargo Bank NA
P.O. Box 8129
Jacksonville, FL 32239-8129

0001701 01 MB 0.387 **AUTO   T7 0 0408 20744-704202 C1-1

ANDREA CANNON
12502 HAXALL CT
FORT WASHINGTON MD 20744-7042

ılı||ılı|lılılıııılıılı||ılı|ılı|ı|ılı||ll|ıılılıı|ıılı|ı|ı|ı|ı|

NOTICE OF TEMPORARY HAZARD
INSURANCE

NOTIFICATION DATE:
08/31/11

ACCOUNT NUMBER:
68068012071480001



EXHIBIT
6

| Insurance Effective Date: | Property Address: |
|---|---|
| 07/16/11 | 1235 QUEEN ST NE<br>WASHINGTON DC 20002 |

Previously we wrote to inform you that we did not have evidence of homeowners/hazard insurance coverage to protect your property per the terms of your Mortgage Deed (or Deed of Trust). We requested that you provide current evidence of homeowners/hazard insurance coverage to us. We have not received a homeowners/hazard policy covering your dwelling.

Therefore, Wells Fargo Bank, N.A. has secured temporary insurance coverage in the form of a binder, effective as of the date shown above. This insurance is provided by QBE Insurance Corporation. This binder cannot be renewed. It covers your dwelling for risks of direct loss subject to the terms of the policy. It does not protect your personal property, nor does it protect you for liability against injuries that occur on your property.

In the mortgage documents you signed, you agreed to keep insurance on your dwelling. Failure to do so is a breach of those requirements. You have the right to purchase insurance from the insurance company of your choice. Please contact your insurance agent or company and purchase coverage. If you have already done so, request proof of coverage and send it to us at the address shown below or fax it to 1-904-732-7781. You may also provide this information to us by visiting our website, **www.updatemyinsurance.com/WellsFargo Bank**. Please be sure your policy includes a Mortgagee Clause or Lenders Loss Payable Endorsement payable to:

WELLS FARGO BANK, N.A.
ITS SUCCESSORS AND/OR ASSIGNS
P O BOX 8129
JACKSONVILLE, FL 32239-0129
Account Number: 68068012071480001

Upon prompt receipt of your policy, this binder will be cancelled. There is no charge to you if there has been no lapse in coverage. You will be charged for any gap between the expiration of your last policy and the effective date of the new policy. If you do not give us proof that you have coverage, we will obtain a one year policy on your property. The full year premium for this policy is shown on the enclosed binder. This premium will be advanced by Wells Fargo Bank, N.A. and will be added as a fee to your account.

WQWRBH01   04/01/11

20110831-00006222

acceptable insurance. You w⋯ be charged for only the days that this ( ⋯cy was in force. Any unused premium will be credited to the premium advance made by Wells Fargo Bank, N.A.

The amount of insurance shown on the binder is based on estimated replacement cost by your insurance company. If you have information to verify that the amount should be different, please notify us in writing and send it to the address shown above. Please include your account number on your letter.

You have the right to independently purchase homeowners/hazard insurance from the insurance agent or company of your choice and we urge you to do so. In nearly all instances, the insurance coverage we obtain may be more expensive than a policy you could obtain from an agent or insurance company of your choice. Our policy will provide coverage only for direct physical damage to the dwelling and will not cover any personal property or contents, nor does it protect you from liability against accidents that occur on your property. The amount of coverage we obtain may be less than you had previously, and Wells Fargo Bank, N.A. will be the named insured. The amount of coverage we obtain may not be adequate to rebuild your dwelling.

The insurance we obtain will be arranged by Wells Fargo Insurance, Inc., a licensed insurance agency and an affiliate of Wells Fargo Bank, N.A. Wells Fargo Insurance, Inc. will receive a commission on the insurance we obtain. Wells Fargo Bank, N.A. is not affiliated with the insurance company.

Thank you for your attention to this matter. If you or your insurance agent have any questions or believe there is an error in our records, please call us at 1–866–445–8407, Monday through Friday from 8:30 am to 8:00 pm, Eastern Time and one of our customer service representatives will be happy to help you.

Sincerely,

Insurance Department

### Fair Debt Collection Practices Act Disclosure

Wells Fargo Bank, N.A. is required by the Fair Debt Collection Practices Act to inform you that, as your loan servicer, we are attempting to collect a debt, and any information obtained will be used for that purpose. However, if you have received a discharge from bankruptcy, and the loan was not reaffirmed in the bankruptcy case, Wells Fargo Bank, N.A. will only exercise its rights against the property and is not attempting to act to collect the discharged debt from you personally.

With respect to those loans located in the State of California, the state Rosenthal Fair Debt Collection Practices Act and the federal Fair Debt Collection Practices Act require that, except under unusual circumstances, collectors may not contact you before 8:00 am or after 9:00 pm. They may not harass you by using threats of violence or arrest or by using obscene language. Collectors may not use false or misleading statements or call you at work if they know or have reason to know that you may not receive personal calls at work. For the most part, collectors may not tell another person, other than your attorney or spouse, about your debt. Collectors may contact another person to confirm your location or enforce a judgment. For more information about debt collection activities, you may contact the Federal Trade Commission at 1–877–FTC–HELP or www.ftc.gov.



EXHIBIT

6

Page 2





WELLS FARGO

Wells Fargo Bank NA
P.O. Box 8129
Jacksonville, FL 32239-8129

**NOTICE OF TEMPORARY HAZARD INSURANCE**

0001202 01 MB 0.401 **AUTO   T5 0 0268 20744-704202 C1-1

ANDREA CANNON
12502 HAXALL CT
FORT WASHINGTON MD 20744-7042

**NOTIFICATION DATE:**
02/09/12

**ACCOUNT NUMBER:**
68068012071480001



EXHIBIT
7

╓╓╫╷╫╷╫╷╫╷╫╷╫╷╫╷╫╷╫╷╫╷╫╷╫╷╫╷╫╷╫╷╫╷╫

| Insurance Effective Date: | Property Address: |
|---|---|
| 07/16/11 | 1235 QUEEN ST NE |
| | WASHINGTON DC 20002 |

Previously we wrote to inform you that we did not have evidence of homeowners/hazard insurance coverage to protect your property per the terms of your Mortgage Deed (or Deed of Trust). We requested that you provide current evidence of homeowners/hazard insurance coverage to us. We have not received a homeowners/hazard policy covering your dwelling.

Therefore, Wells Fargo Bank, N.A. has secured temporary insurance coverage in the form of a binder, effective as of the date shown above. This insurance is provided by QBE Insurance Corporation. This binder cannot be renewed. It covers your dwelling for risks of direct loss subject to the terms of the policy. It does not protect your personal property, nor does it protect you for liability against injuries that occur on your property.

In the mortgage documents you signed, you agreed to keep insurance on your dwelling. Failure to do so is a breach of those requirements. You have the right to purchase insurance from the insurance company of your choice. Please contact your insurance agent or company and purchase coverage. If you have already done so, request proof of coverage and send it to us at the address shown below or fax it to 1-904-732-7781. You may also provide this information to us by visiting our website, **www.updatemyinsurance.com/WellsFargo_Bank**. Please be sure your policy includes a Mortgagee Clause or Lenders Loss Payable Endorsement payable to:

WELLS FARGO BANK, N.A.
ITS SUCCESSORS AND/OR ASSIGNS
P O BOX 8129
JACKSONVILLE, FL 32239-0129
Account Number: 68068012071480001

Upon prompt receipt of your policy, this binder will be cancelled. There is no charge to you if there has been no lapse in coverage. You will be charged for any gap between the expiration of your last policy and the effective date of the new policy. If you do not give us proof that you have coverage, we will obtain a one year policy on your property. The full year premium for this policy is shown on the enclosed binder. This premium will be advanced by Wells Fargo Bank, N.A. and will be added as a fee to your account.

You may cancel any policy we purchase on your property at any time by giving us proof of other acceptable insurance. You will be charged for only the days that this policy was in force. Any unused premium will be credited to the premium advance made by Wells Fargo Bank, N.A.

The amount of insurance shown on the binder is based on estimated replacement cost by your insurance company. If you have information to verify that the amount should be different, please notify us in writing and send it to the address shown above. Please include your account number on your letter.

**You have the right to independently purchase homeowners/hazard insurance from the insurance agent or company of your choice and we urge you to do so. In nearly all instances, the insurance coverage we obtain may be more expensive than a policy you could obtain from an agent or insurance company of your choice. Our policy will provide coverage only for direct physical damage to the dwelling and will not cover any personal property or contents, nor does it protect you from liability against accidents that occur on your property. The amount of coverage we obtain may be less than you had previously, and Wells Fargo Bank, N.A. will be the named insured. The amount of coverage we obtain may not be adequate to rebuild your dwelling.**

The insurance we obtain will be arranged by Wells Fargo Insurance, Inc., a licensed insurance agency and an affiliate of Wells Fargo Bank, N.A. Wells Fargo Insurance, Inc. will receive a commission on the insurance we obtain. Wells Fargo Bank, N.A., is not affiliated with the insurance company.

Thank you for your attention to this matter. If you or your insurance agent have any questions or believe there is an error in our records, please call us at 1-866-445-8407, Monday through Friday from 8:30 am to 8:00 pm, Eastern Time and one of our customer service representatives will be happy to help you.

Sincerely,

Insurance Department

### Fair Debt Collection Practices Act Disclosure

Wells Fargo Bank, N.A. is required by the Fair Debt Collection Practices Act to inform you that, as your loan servicer, we are attempting to collect a debt, and any information obtained will be used for that purpose. However, if you have received a discharge from bankruptcy, and the loan was not reaffirmed in the bankruptcy case, Wells Fargo Bank, N.A. will only exercise its rights against the property and is not attempting to act to collect the discharged debt from you personally.

With respect to those loans located in the State of California, the state Rosenthal Fair Debt Collection Practices Act and the federal Fair Debt Collection Practices Act require that, except under unusual circumstances, collectors may not contact you before 8:00 am or after 9:00 pm. They may not harass you by using threats of violence or arrest or by using obscene language. Collectors may not use false or misleading statements or call you at work if they know or have reason to know that you may not receive personal calls at work. For the most part, collectors may not tell another person, other than your attorney or spouse, about your debt. Collectors may contact another person to confirm your location or enforce a judgment. For more information about debt collection activities, you may contact the Federal Trade Commission at 1-877-FTC-HELP or www.ftc.gov.





QBE Insurance Corporation
88 Pine Street, 16th Floor
New York, NY 10005
Home Office:  c/o CT Corporation System
116 Pine Street, Suite 320
Harrisburg, PA 17101

Toll Free Customer Service: 1-866-445-8407
P O BOX 8129, JACKSONVILLE, FL 32239-0129

EXHIBIT
8



### 90-DAY BINDER

LOAN NUMBER:  68068012071480001

NOTIFICATION DATE:  02/09/12

**NAMED INSURED**
ANDREA CANNON
12502 HAXALL CT
FORT WASHINGTON MD 20744

**MORTGAGEE**
WELLS FARGO BANK, N.A.
ITS SUCCESSORS AND/OR ASSIGNS
P O BOX 8129
JACKSONVILLE, FL 32239-0129

| | | | Amount of Insurance | | Premium |
|---|---|---|---|---|---|
| BINDER NUMBER  BFI002595046 | Dwelling | | $  319,200 | $ | 3,064.32 |
| POLICY TERM: | | | | | |
| FROM 07/16/11   TO 07/16/12 | Deductible - per loss occurrence | | | | |
| ☐ NOON  ☒ 12:01am | Property is VACANT at time of loss | $ | 1,000 | | |
| | Vandalism & Malicious Mischief | $ | 1,000 | | |
| BINDER IS EFFECTIVE FOR 90 DAYS FROM THE EFFECTIVE DATE SHOWN ABOVE | All Other covered Losses | $ | 500 | | |
| PROPERTY LOCATION | | | | $ | |
| 1235 QUEEN ST NE | | | | $ | |
| WASHINGTON DC 20002 | | | | $ | |
| | | | | $ | |
| | | | | $ | |
| | | | | $ | |
| | | | | $ | |
| | | TOTAL CHARGES | | $ | 3,064.32 |

We have not received a new/renewal insurance policy covering your mortgaged property. We do not believe this was your intention, but a lapse in coverage has occurred.

We have secured temporary coverage in the form of a 90-day binder through the Company shown above and you will be charged for the policy premium. This binder covers the described property for risks of direct loss subject to the terms, conditions, and limitations of the policy in current use by the company. If evidence of acceptable coverage is received during this binder period, you will be charged only for any lapse in coverage. This coverage will be cancelled back to the original effective date, with no premium charge applying, if you provide coverage effective on or before the effective date of this binder. Please remember, it is your responsibility to maintain property insurance coverage on your property. If evidence of acceptable coverage is not received, a policy will be obtained through the Company shown above.

### IMPORTANT NOTICE:

This binder covers the residence only. No coverage is provided for your personal property, additional living expense, or personal liability coverage.

For Customer Service questions, please call our toll free Customer Service Number at: 1-866-445-8407

To report a CLAIM, please contact our Claim Department at: 1-800-824-8562
or, you may report a new claim using our website at www.qbefirst.com

0570811    GREAT AMERICAN ASSURANCE CO

**GREAT**AMERICAN.
INSURANCE GROUP

Administrative Offices
301 E 4th Street
Cincinnati, Ohio 45202-4201
tel: 513 369 5000

CP 72 00   (Ed.11/85)

Policy: PAC 614-56-98   03

## BUSINESSPRO PROPERTY COVERAGE PART
## DECLARATION PAGE

**DESCRIBED PREMISES:** At the locations specified below, insurance is provided only for those coverages for which a Limit of Insurance has been inserted.

| Location | Building | Location | Occupancy |
|---|---|---|---|
| 003 | 01 | 1235 QUEEN STREET, N.E.<br>WASHINGTON<br>DC 20002 | DAY CARE |

COVERAGE: Building
  Limit of Insurance:      $319,200        Valuation: Replacement Cost
  Coinsurance Percent (%):      80         Deductible Amount:      $1,000
  Covered Causes of Loss:
    Special Including Theft

COVERAGE: Personal Property of Insured - Item 001
  Limit of Insurance:      $6,553         Valuation: Replacement Cost
  Coinsurance Percent (%):      80         Deductible Amount:      $1,000
  Covered Causes of Loss:
    Special Including Theft

Mortgage Holder Name and Mailing Address:
 WELLS FARGO BANK NA ISAOA ATIMA
 PO BOX 8129 JACKSONVILLE, FL 32239-8129

| Location | Building | Location | Occupancy |
|---|---|---|---|
| 004 | 01 | 331 H STREET, N.E<br>WASHINGTON<br>DC 20002 | DAY CARE |

COVERAGE: Personal Property of Insured - Item 001
  Limit of Insurance:      $5,250         Valuation: Replacement Cost
  Coinsurance Percent (%):      80         Deductible Amount:      $1,000
  Covered Causes of Loss:
    Special Including Theft

EXHIBIT
9

BUSINESSPRO (Reg. U.S. Pat. Off.)



0570811    GREAT AMERICAN ASSURANCE CO

GREAT AMERICAN
INSURANCE GROUP

Administrative Offices
301 E 4th Street
Cincinnati, Ohio 45202-4201
tel: 513 369 5000

**IL 70 01 (Ed. 10 07)**

**Policy No.** PAC 614-56-98 - 03
Renewal Of PAC 614-56-98 - 02

## BUSINESSPRO® POLICY COMMON DECLARATIONS



EXHIBIT
9-A

**NAMED INSURED** NEWCOMB DAY CARE AND LEARNING
                   CENTER
**AND ADDRESS:** 12502 HAXAL COURT
                   FT. WASHINGTON, MD 20744

IN RETURN FOR PAYMENT OF THE
PREMIUM, AND SUBJECT TO ALL
TERMS OF THIS POLICY, WE AGREE
WITH YOU TO PROVIDE THE INSURANCE
AS STATED IN THIS POLICY.

AGENT'S NAME AND ADDRESS:
OLD DOMINION INSURANCE AGENCY

1451 BELLE HAVEN RD # 230
ALEXANDRIA, VA 22307 1201

Insurance is afforded by the Company named below, a Capital Stock Corporation:
GREAT AMERICAN ASSURANCE COMPANY

**POLICY PERIOD:** From 07/16/2011 To 07/16/2012
12:01 A.M. Standard Time at the address of the Named Insured

This policy consists of the following Coverage Parts for which a premium is indicated. This premium may be subject to adjustment.

|  | Premium |
|---|---|
| Commercial Property | $1,680.00 |
| Commercial General Liability | $3,882.00 |
| Commercial Crime and Fidelity | |
| Commercial Inland Marine | |
| Commercial Equipment Breakdown | $208.00 |
| Commercial Auto | |
| Commercial Umbrella | |
| **TOTAL** | $5,770.00 |

**FORMS AND ENDORSEMENTS** applicable to all Coverage Parts and made part of this Policy at time of issue are listed on the attached Forms and Endorsement Schedule, IL 88 01 (11/85).

Countersigned _____      By _____
              Date                           Authorized Representative



Preparer/Return To:
KATRINA SIPICS
Wachovia Bank, National Association
Retail Credit Servicing
P.O. Box 50010
Roanoke, VA 24022

(Space Above This Line For Recording Data)

# DEED OF TRUST

## DEFINITIONS

Words used in multiple sections of this document are defined below and other words are defined elsewhere in this document. Certain rules regarding the usage of words used in this document are also provided in Section 15.

**(A) "Security Instrument"** means this document, which is dated <u>29   December, 2007</u>.
**(B) "Borrower"** means the parties obligated on the Debt Instrument.
**(C) "Trustor"** under this Security Instrument is _____
**CANNON  ANDREA**

_____

**(D) "Lender"** is Wachovia Bank, National Association.   Lender is a national banking association organized and existing under the laws of The United States of America. Lender's address is Wachovia Bank, National Association, 301 South College Street, VA 0343, Charlotte, N.C.  28288-0343. Lender is the beneficiary under this Security Instrument.
**(E) "Trustee"** is Tiste, Inc.  Trustee's mailing address is 7711 Plantation Road, VA 0343, Roanoke, N.C. 24019.
**(F) "Debt Instrument"** means the promissory note signed by Borrower and dated <u>12/29/07</u>.
The Debt Instrument states that Lender is owed (U.S. $ <u>307665.50</u> )
plus interest to be repaid in regular Periodic Payments and in full not later than <u>01/16/38</u>.
**(G) "Property"** means the property that is located at _____ <u>1235  QUEEN  ST  NE</u>
_____ **WASHINGTON  DC   20002**
("Property Address")
and that is further described below under the heading "Transfer of Rights in the Property."
**(H) "Loan"** means all amounts owed now or hereafter under the Debt Instrument, including without limitation principal, interest, any prepayment charges, late charges and other fees and charges due under the Debt Instrument, and also all sums due under this Security Instrument, plus interest.
**(I) "Applicable Law"** means all controlling applicable federal law and, to the extent not preempted by federal law, state and local statutes, regulations, ordinances and administrative rules and orders (that have the effect of law) as well as all applicable final, non-appealable judicial opinions.
**(J) "Community Association Dues, Fees, and Assessments"** means all dues, fees, assessments and other charges that are imposed on Trustor or the Property by a condominium association, homeowners association or similar organization.
**(K) "Electronic Funds Transfer"** means any transfer of funds, other than a transaction originated by check, draft, or similar paper instrument, which is initiated through an electronic terminal, telephonic instrument, computer, or magnetic tape so as to order, instruct, or authorize a financial institution to debit or credit an account.  Such term includes, but is not limited to, point-of-sale transfers, automated teller machine transactions, transfers initiated by telephone, wire transfers, and automated clearing house transfers.
**(L) "Escrow Items"** means those items that are described in Section 3.
**(M) "Miscellaneous Proceeds"** means any compensation, settlement, award of damages, or proceeds paid by any third party (other than insurance proceeds paid under the coverages described in Section 5)for: (i) damage to, or destruction of, the Property; (ii) condemnation or other taking of all or any part of the Property; (iii) conveyance in lieu of condemnation; or (iv) misrepresentations of, or omissions as to, the value and/or condition of the Property.

**(N) "Periodic Payment"** means the amounts as they become due for (i) principal, interest and other charges as provided for in the Debt Instrument, plus (ii) any amounts under Section 3 of this Security Instrument.

**(O) "RESPA"** means the Real Estate Settlement Procedures Act (12 U.S.C. §2601 et seq.) and its implementing regulation, Regulation X (24 C.F.R. Part 3500), as they might be amended from time to time, or any additional or successor legislation or regulation that governs the same subject matter. As used in this Security Instrument, "RESPA" refers to all requirements and restrictions that are imposed in regard to a "federally related mortgage loan" even if the Loan does not qualify as a "federally related mortgage loan" under RESPA.

**(P) "Successor in Interest of Trustor"** means any party that has taken title to the Property, whether or not that party has assumed Borrower's obligations under the Debt Instrument and/or this Security Instrument.

## TRANSFER OF RIGHTS IN THE PROPERTY

This Security Instrument secures to Lender: (i) the repayment of the Loan, and all renewals, extensions and modifications of the Debt Instrument; and (ii) the performance of Trustor's covenants and agreements under this Security Instrument and Borrower's covenants and agreements under the Debt Instrument. For this purpose, Trustor irrevocably grants and conveys to Trustee, in trust, with power of sale, the following described property located in the County of ___DISTRICT OF COLUMBIA___, District of Columbia:

| | | | |
|---|---|---|---|
| DEED DATE: | RECORDED: | BOOK/INST: PAGE: | |
| PARCEL/TAX ID #: | | TWP/BORO: | |
| BRT: | | WARD: | |
| LOT: | BLOCK: | MAP PLAT: | |



TOGETHER WITH all the improvements now or hereafter erected on the property, and all easements, appurtenances, and fixtures now or hereafter a part of the property. All replacements and additions shall also be covered by this Security Instrument. If the Property is a multifamily (2-4 family) dwelling, then the following items now or hereafter attached to the Property to the extent they are fixtures are also covered by this Security Instrument: building materials, appliances and goods of every nature whatsoever now or hereafter located in, on, or used, or intended to be used in connection with the Property, including, but not limited to, those for the purposes of supplying or distributing heating, cooling, electricity, gas, water, air and light, fire prevention and extinguishing apparatus, security and access control apparatus, plumbing, bath tubs, water heaters, water closets, sinks, ranges, stoves, refrigerators, dishwashers, disposals, washers, dryers, awnings, storm windows, storm doors, screens, blinds, shades, curtains and curtain rods, attached mirrors, cabinets, paneling and attached floor coverings, all of which, including replacements and additions thereto, shall be deemed to be and remain a part of the Property covered by this Security Instrument. All of the foregoing is referred to in this Security Instrument as the "Property."

If the Property includes a unit in, together with an undivided interest in the common elements of, a condominium project (the "Condominium Project") and if the owners association or other entity which acts for the Condominium Project (the "Owners Association") holds title to property for the benefit or use of its members or shareholders, the Property also includes Trustor's interest in the Owners Association and the uses, proceeds and benefits of Trustor's interest.

If the Property is a part of a planned unit development (the "PUD"), the Property also includes Trustor's interest in the homeowners association or equivalent entity owning or managing the common areas and facilities of the PUD (the "Owners Association") and the uses, benefits and proceeds of Trustor's interest.

TRUSTOR COVENANTS that Trustor is lawfully seised of the estate hereby conveyed and has the right to grant and convey the Property and that the Property is unencumbered, except for encumbrances of record. Trustor warrants and will defend generally the title to the Property against all claims and demands, subject to any encumbrances of record.

UNIFORM COVENANTS. Trustor and Lender covenant and agree as follows:

**1. Payment of Principal, Interest, Escrow Items, Prepayment and Other Charges.** Borrower shall pay when due the principal of, and interest on, the debt evidenced by the Debt Instrument and any prepayment charges, late charges and other charges due under the Debt Instrument. Borrower shall also pay funds for Escrow Items pursuant to Section 3. Payments due under the Debt Instrument and this Security Instrument shall be made in U.S. currency. However, if any check or other instrument received by Lender as payment under the Debt Instrument or this Security Instrument is returned to Lender unpaid, Lender may require that any or all subsequent payments due under the Debt Instrument and this Security Instrument be made in one or more of the following forms, as selected by Lender: (a) cash; (b) money order; (c) certified check, bank check, treasurer's check or cashier's check, provided any such check is drawn upon an institution whose deposits are insured by a federal agency, instrumentality, or entity; or (d) Electronic Funds Transfer.

Payments are deemed received by Lender when received at the location designated in (or in accordance with) the Debt Instrument or at such other location as may be designated by Lender in accordance with the notice provisions in Section 14. Subject to Applicable Law, Lender may return any payment or partial payment if the payment or partial payments are insufficient to bring the Loan current. Lender may accept any payment or partial payment insufficient to bring the Loan current, without waiver of any rights hereunder or prejudice to its rights to refuse such payment or partial payments in the future. Payments shall be applied as permitted by applicable law and as provided in the Debt Instrument.

**2. Application of Payments or Proceeds.** Unless other procedures are set forth in the Debt Instrument or Applicable Law and as otherwise described in this Section 2, the following provisions in this Section 2 shall govern the application of payments and proceeds with respect to the Loan. All payments accepted and applied by Lender shall be applied in the following order of priority: (a) interest due under the Debt Instrument; (b) principal due under the Debt Instrument; (c) amounts due under Section 3. Such payments shall be applied to each Periodic Payment in the order in which it became due. Any remaining amounts shall be applied first to late charges, second to any other amounts due under this Security Instrument, and then to reduce the principal balance of the Debt Instrument.

If Lender receives a payment from Borrower for a delinquent Periodic Payment which includes a sufficient amount to pay any late charge due, the payment may be applied to the delinquent payment and the late charge. If more than one Periodic Payment is outstanding, Lender may apply any payment received from Borrower to the repayment of the Periodic Payments if, and to the extent that, each payment can be paid in full. To the extent that any excess exists after the payment is applied to the full payment of one or more Periodic Payments, such excess may be applied to any late charges and other charges due. Voluntary prepayments shall be applied first to any prepayment charges and then as described in the Debt Instrument.

Unless other procedures are set forth in the Debt Instrument, any application of payments, insurance proceeds, or Miscellaneous Proceeds to principal due under the Debt Instrument shall not extend or postpone the due date, or change the amount, of the Periodic Payments.

**3. Funds for Escrow Items.** The Lender does not require or provide for escrow at the time this Security Instrument is signed. Accordingly, the provisions of this Section 3 shall apply only if at any time any Escrow Item, as described below and including any Community Association Dues, Fees, and Assessments, is not paid when due, and Lender gives Borrower notice that these provisions will thereafter apply. Until such notice is provided, Borrower shall have no obligation under this Section 3. When the escrow is established, Borrower shall pay to Lender for deposit in an escrow account such amounts (the "Funds") as permitted by applicable law. Thereafter, Borrower shall pay to Lender on the day Periodic Payments are due under the Debt Instrument, until the Debt Instrument is paid in full, a sum to be added to the Funds to provide for payment of amounts due for: (a) taxes and assessments and other items which can attain priority over this Security Instrument as a lien or encumbrance on the Property; (b) leasehold payments or ground rents on the Property, if any; and (c) premiums for any and all insurance required by Lender under Section 5. These items are called "Escrow Items." Lender may require that Community Association Dues, Fees, and Assessments, if any, be escrowed by Borrower, and such Community Association Dues, Fees, and Assessments shall be an Escrow Item. Trustor or Borrower shall promptly furnish to Lender all notices of amounts to be paid under this Section. Borrower shall pay Lender the Funds for Escrow Items unless Lender waives Borrower's obligation to pay the Funds for any or all Escrow Items. Lender may waive Borrower's obligation to pay to Lender Funds for any or all Escrow Items at any time. Any such waiver may only be in writing. In the event of such waiver, Borrower shall pay directly, when and where payable, the amounts due for any Escrow Items for which payment of Funds has been waived by Lender and, if Lender requires, shall furnish to Lender receipts evidencing such payment within such time period as Lender may require. Borrower's obligation to make such payments and to provide receipts shall for all purposes be deemed to be a covenant and agreement contained in this Security Instrument, as the phrase "covenant and agreement" is used in Section 9. If Borrower is obligated to pay Escrow Items directly, pursuant to a waiver, and Borrower fails to pay the amount due for an Escrow Item, Lender may exercise its rights under Section 9 and pay such amount and Borrower shall then be obligated under Section 9 to repay to Lender any such amount. Lender may revoke the waiver as to any or all Escrow Items at any time by a notice given in accordance with Section 14 and, upon such revocation, Borrower shall pay to Lender all Funds, and in such amounts, that are then required under this Section 3.

Lender may, at any time, collect and hold Funds in an amount (a) sufficient to permit Lender to apply the Funds at the time specified under RESPA, if applicable, and (b) not to exceed the maximum amount a lender can require under RESPA, if applicable. Lender shall estimate the amount of Funds due on the basis of current data and reasonable estimates of expenditures of future Escrow Items or otherwise in accordance with Applicable Law.

The Funds shall be held in an institution whose deposits are insured by a federal agency, instrumentality, or entity (including Lender, if Lender is an institution whose deposits are so insured) or in any Federal Home Loan Bank. Lender shall apply the Funds to pay the Escrow Items no later than the time specified under RESPA, if applicable. Lender shall not charge Borrower for holding and applying the Funds, annually analyzing the escrow account, or verifying the Escrow Items, unless Lender pays Borrower interest on the Funds and Applicable Law permits Lender to make such a charge. Unless an agreement is made in writing or Applicable Law requires interest to be paid on the Funds, Lender shall not be required to pay Borrower any interest or earnings on the Funds. Borrower and Lender can agree in writing, however, that interest shall be paid on the Funds. Lender shall give to Borrower, without charge, an annual accounting of the Funds as required by RESPA, if applicable.

If there is a surplus of Funds held in escrow, as defined under RESPA, Lender shall account to Borrower for the excess funds in accordance with RESPA, if applicable. If RESPA is applicable and there is a shortage of Funds held in escrow, as defined under RESPA, Lender shall notify Borrower as required by RESPA, and Borrower shall pay to Lender the amount necessary to make up the shortage in accordance with RESPA, but in no more than 12 monthly payments. If RESPA is applicable and there is a deficiency of Funds held in escrow, as defined under RESPA, Lender shall notify Borrower as required by RESPA, and Borrower shall pay to Lender the amount necessary to make up the deficiency in accordance with RESPA, but in no more than 12 monthly payments.

Upon payment in full of all sums secured by this Security Instrument, Lender shall promptly refund to Borrower any Funds held by Lender.

**4.  Charges; Liens.**    Trustor shall pay all taxes, assessments, charges, fines, and impositions attributable to the Property which can attain priority over this Security Instrument, leasehold payments or ground rents on the Property, if any, and Community Association Dues, Fees, and Assessments, if any. To the extent that these items are Escrow Items, they shall be paid in the manner provided in Section 3, if Borrower is obligated to do so under Section 3.

Trustor shall promptly discharge any lien which has priority over this Security Instrument unless: (a) such lien was disclosed on the application for the Loan that Borrower provided to Lender or Trustor agrees in writing to the payment of the obligation secured by the lien in a manner acceptable to Lender, but only so long as Trustor is performing such agreement; (b) Trustor contests the lien in good faith by, or defends against enforcement of the lien in, legal proceedings which in Lender's opinion operate to prevent the enforcement of the lien while those proceedings are pending, but only until such proceedings are concluded; or (c) Trustor secures from the holder of the lien an agreement satisfactory to Lender subordinating the lien to this Security Instrument.  If Lender determines that any part of the Property is subject to a lien that can attain priority over this Security Instrument and which was not disclosed on the application for the Loan that Borrower provided to Lender, Lender may give Trustor a notice identifying the lien. Within 10 days of the date on which that notice is given, Trustor shall satisfy the lien or take one or more of the actions satisfactory to Lender set forth above in this Section 4.

Lender may require Borrower to pay a one-time charge for a real estate tax verification and/or reporting service used by Lender in connection with this Loan.

**5.  Property Insurance.**  Trustor shall keep the improvements now existing or hereafter erected on the Property insured against loss by fire, hazards included within the term "extended coverage," and any other hazards including, but not limited to, earthquakes and floods, for which Lender requires insurance. If the Property is a multifamily (2-4 family) dwelling, Trustor shall also maintain insurance against rent loss.  All such property insurance shall be maintained in the amounts (including deductible levels) and for the periods that Lender requires.  What Lender requires pursuant to the preceding sentences can change during the term of the Loan.  The insurance carrier providing the insurance shall be chosen by Trustor subject to Lender's right to disapprove Trustor's choice, which right shall not be exercised unreasonably. Lender may require Borrower to pay, in connection with this Loan, either: (a) a one-time charge for flood zone determination, certification and tracking services; or (b) a one-time charge for flood zone determination and certification services and subsequent charges each time remappings or similar changes occur which reasonably might affect such determination or certification.  Borrower shall also be responsible for the payment of any fees imposed by the Federal Emergency Management Agency in connection with the review of any flood zone determination resulting from an objection by Trustor.

If Trustor fails to maintain any of the coverages described above, Lender may obtain insurance coverage, at Lender's option and Borrower's expense.  Lender is under no obligation to purchase any particular type or amount of coverage.  Therefore, such coverage shall cover Lender, but might or might not protect Trustor, Trustor's equity in the Property, or the contents of the Property, against any risk, hazard or liability and might provide greater or lesser coverage than was previously in effect.  Borrower acknowledges that the cost of the insurance coverage so obtained might significantly exceed the cost of insurance that Trustor could have obtained.  Any amounts disbursed by Lender under this Section 5 shall become additional debt of Borrower secured by this Security Instrument.  These amounts shall bear interest at the rate applicable to the Debt Instrument from time to time, from the date of disbursement and shall be payable, with such interest, upon notice from Lender to Borrower requesting payment.

All insurance policies required by Lender and renewals of such policies shall be subject to Lender's right to disapprove such policies, shall include a standard mortgage clause, and shall name Lender as mortgagee and/or as an additional loss payee and Trustor further agrees to generally assign rights to insurance proceeds to the holder of the Debt Instrument up to the amount of the outstanding loan balance.  If Lender requires, Trustor shall promptly give to Lender copies of all policies, renewal certificates, receipts of paid premiums and renewal notices.  If Trustor obtains any form of insurance coverage, not otherwise required by Lender, for damage to, or destruction of, the Property, such policy shall include a standard mortgage clause and shall name Lender as mortgagee and/or as an additional loss payee and Trustor further agrees to generally assign rights to insurance proceeds to the holder of the Debt Instrument up to the amount of the outstanding loan balance.

In the event of loss and subject to the rights of any lienholder with rights to insurance proceeds that are superior to Lender's rights, the following provisions in this Section 5 shall apply.  Trustor shall give prompt notice to the insurance carrier and Lender.  Lender may make proof of loss if not made promptly by Trustor.  Unless Lender and Trustor otherwise agree in writing, any insurance proceeds, whether or not the underlying insurance was required by Lender, shall be applied to restoration or repair of the Property, if the restoration or repair is economically feasible and Lender's security is not lessened.  During such repair and restoration period, Lender shall have the right to hold such insurance proceeds until Lender has had an opportunity to inspect such Property to ensure the work has been completed to Lender's satisfaction, provided that such inspection shall be undertaken promptly.  Lender may disburse proceeds for the repairs and restoration in a single payment or in a series of progress payments as the work is completed.  Unless an agreement is made in writing or Applicable Law requires interest to be paid on such insurance proceeds, Lender shall not be required to pay any interest or earnings on such proceeds. Fees for public adjusters, or other third parties, retained by Trustor shall not be paid out of the insurance proceeds and shall be the sole obligation of Trustor.  If the restoration or repair is not economically feasible or Lender's security would be lessened, the insurance proceeds shall be applied to the sums

secured by this Security Instrument, whether or not then due, with the excess, if any, paid to Trustor. Such insurance proceeds shall be applied in the order provided for in Section 2.

If Trustor abandons the Property, Lender may file, negotiate and settle any available insurance claim and related matters. If Trustor does not respond within 30 days to a notice from Lender that the insurance carrier has offered to settle a claim, then Lender may negotiate and settle the claim. The 30-day period will begin when the notice is given. In either event, or if Lender acquires the Property under Section 21 or otherwise, Trustor hereby assigns to Lender (a) Trustor's rights to any insurance proceeds in an amount not to exceed the amounts unpaid under the Debt Instrument or this Security Instrument, and (b) any other of Trustor's rights (other than the right to any refund of unearned premiums paid by Trustor) under all insurance policies covering the Property, insofar as such rights are applicable to the coverage of the Property. Lender may use the insurance proceeds either to repair or restore the Property or to pay amounts unpaid under the Debt Instrument or this Security Instrument, whether or not then due, subject to the rights of any lienholder with rights to insurance proceeds that are superior to Lender's rights.

**6.   Occupancy.**  Unless Trustor is a corporation, association or partnership, Trustor shall occupy, establish, and use the Property as Trustor's principal residence within 60 days after the execution of this Security Instrument and shall continue to occupy the Property as Trustor's principal residence for at least one year after the date of occupancy, unless (a) Borrower has disclosed on the application for the Loan that Borrower provided to Lender that the Property shall not be Trustor's principal residence; (b) Lender otherwise agrees in writing, which consent shall not be unreasonably withheld; or (c) unless extenuating circumstances exist which are beyond Trustor's control.

If Borrower indicated on the application for the Loan that the Property will be a second home and not Trustor's principal residence, then Trustor shall occupy, and shall only use, the Property as Trustor's second home. Trustor shall keep the Property available for Trustor's exclusive use and enjoyment at all times, and shall not subject the Property to any timesharing or other shared ownership arrangement or to any rental pool or agreement that requires Trustor either to rent the Property or give a management firm or any other person any control over the occupancy or use of the Property.

This Section 6 does not apply if the Property is a multifamily (2-4 family) dwelling, unless Lender and Trustor otherwise agree in writing.

**7.   Preservation, Maintenance and Protection of the Property; Inspections.**  Trustor shall not destroy, damage or impair the Property, allow the Property to deteriorate or commit waste on the Property. Whether or not Trustor is residing in the Property, Trustor shall maintain the Property in order to prevent the Property from deteriorating or decreasing in value due to its condition. Unless it is determined pursuant to Section 5 that repair or restoration is not economically feasible, Trustor shall promptly repair the Property if damaged to avoid further deterioration or damage. If insurance or condemnation proceeds are paid in connection with damage to, or the taking of, the Property, Trustor shall be responsible for repairing or restoring the Property only if Lender has released proceeds for such purposes. Lender may disburse proceeds for the repairs and restoration in a single payment or in a series of progress payments as the work is completed. If the insurance or condemnation proceeds are not sufficient to repair or restore the Property, Trustor is not relieved of Trustor's obligation for the completion of such repair or restoration.

Lender or its agent may make reasonable entries upon and inspections of the Property. If it has reasonable cause, Lender may inspect the interior of the improvements on the Property. Lender shall give Trustor notice at the time of or prior to such an interior inspection specifying such reasonable cause.

**8.   Borrower's Loan Application.**  Borrower shall be in default if, during the Loan application process, Borrower or any persons or entities acting at the direction of Borrower or with Borrower's knowledge or consent gave materially false, misleading, or inaccurate information or statements to Lender (or failed to provide Lender with material information) in connection with the Loan. Material representations include, but are not limited to, (a) representations concerning Trustor's occupancy of the Property as Trustor's principal residence or second home and (b) liens on the Property that have priority over this Security Instrument.

**9.   Protection of Lender's Interest in the Property and Rights Under this Security Instrument.**  If (a) Trustor fails to perform the covenants and agreements contained in this Security Instrument or any obligation that is secured by a lien that is superior to this Security Instrument, (b) there is a legal proceeding that might significantly affect Lender's interest in the Property and/or rights under this Security Instrument (such as a proceeding in bankruptcy, probate, for condemnation or forfeiture, for enforcement of any lien which may attain priority over this Security Instrument or to enforce laws or regulations), or (c) Trustor has abandoned the Property, then Lender may do and pay for whatever is reasonable or appropriate to protect Lender's interest in the Property and rights under this Security Instrument, including protecting and/or assessing the value of the Property, and securing and/or repairing the Property. Lender's actions can include, but are not limited to: (a) paying any sums secured by a lien which has priority over this Security Instrument; (b) appearing in court; and (c) paying reasonable attorneys' fees to protect its interest in the Property and/or rights under this Security Instrument, including its secured position in a bankruptcy proceeding. Securing the Property includes, but is not limited to, entering the Property to make repairs, change locks, replace or board up doors and windows, drain water from pipes, eliminate building or other code violations or dangerous conditions, and have utilities turned on or off. Although Lender may take action under this Section 9, Lender does not have to do so and is not under any duty or obligation to do so. It is agreed that Lender incurs no liability for not taking any or all actions authorized under this Section 9.

Any amounts disbursed by Lender under this Section 9 shall become additional debt of Borrower secured by this Security Instrument. These amounts shall bear interest at the rate applicable to the Debt Instrument from time to time, from the date of disbursement and shall be payable, with such interest, upon notice from Lender to Borrower requesting payment.

If this Security Instrument is on a leasehold, Trustor shall comply with all the provisions of the lease. If Trustor acquires fee title to the Property, the leasehold and the fee title shall not merge unless Lender agrees to the merger in writing.

**10. Assignment of Miscellaneous Proceeds; Forfeiture.**  All Miscellaneous Proceeds are hereby assigned to and shall be paid to Lender, subject to the rights of any lienholder with rights to Miscellaneous Proceeds that are superior to Lender's rights.

If the Property is damaged, such Miscellaneous Proceeds shall be applied to restoration or repair of the Property, if the restoration or repair is economically feasible and Lender's security is not lessened. During such repair and restoration period, Lender shall have the right to hold such Miscellaneous Proceeds until Lender has had an opportunity to inspect such Property to ensure the work has been completed to Lender's satisfaction, provided that such inspection shall be undertaken promptly.  Lender may pay for the repairs and restoration in a single disbursement or in a series of progress payments as the work is completed.  Unless an agreement is made in writing or Applicable Law requires interest to be paid on such Miscellaneous Proceeds, Lender shall not be required to pay Trustor any interest or earnings on such Miscellaneous Proceeds.  Subject to the rights of any lienholder with rights to Miscellaneous Proceeds that are superior to Lender's rights, if the restoration or repair is not economically feasible or Lender's security would be lessened, the Miscellaneous Proceeds shall be applied to the sums secured by this Security Instrument, whether or not then due, with the excess, if any, paid to Trustor.  Such Miscellaneous Proceeds shall be applied in the order provided for in Section 2.

Subject to the rights of any lienholder with rights to Miscellaneous Proceeds that are superior to Lender's rights, in the event of a total taking, destruction, or loss in value of the Property, the Miscellaneous Proceeds shall be applied to the sums secured by this Security Instrument, whether or not then due, with the excess, if any, paid to Trustor.

In the event of a partial taking, destruction, or loss in value of the Property in which the fair market value of the Property immediately before the partial taking, destruction, or loss in value is equal to or greater than the amount of the sums secured by this Security Instrument immediately before the partial taking, destruction, or loss in value, unless Trustor and Lender otherwise agree in writing, the sums secured by this Security Instrument shall be reduced by the amount of the Miscellaneous Proceeds multiplied by the following fraction: (a) the total amount of the sums secured immediately before the partial taking, destruction, or loss in value divided by (b) the fair market value of the Property immediately before the partial taking, destruction, or loss in value.  Subject to the rights of any lienholder with rights to Miscellaneous Proceeds that are superior to Lender's rights, any balance shall be paid to Trustor.

In the event of a partial taking, destruction, or loss in value of the Property in which the fair market value of the Property immediately before the partial taking, destruction, or loss in value is less than the amount of the sums secured immediately before the partial taking, destruction, or loss in value, unless Trustor and Lender otherwise agree in writing, the Miscellaneous Proceeds shall be applied to the sums secured by this Security Instrument whether or not the sums are then due, subject to the rights of any lienholder with rights to Miscellaneous Proceeds that are superior to Lender's rights.

If the Property is abandoned by Trustor, or if, after notice by Lender to Trustor that the Opposing Party (as defined in the next sentence) offers to make an award to settle a claim for damages, Trustor fails to respond to Lender within 30 days after the date the notice is given, Lender is authorized to collect and apply the Miscellaneous Proceeds either to restoration or repair of the Property or to the sums secured by this Security Instrument, whether or not then due, subject to the rights of any lienholder with rights to Miscellaneous Proceeds that are superior to Lender's rights.  "Opposing Party" means the third party that owes Trustor Miscellaneous Proceeds or the party against whom Trustor has a right of action in regard to Miscellaneous Proceeds.

Trustor shall be in default if any action or proceeding, whether civil or criminal, is begun that, in Lender's judgment, could result in forfeiture of the Property or other material impairment of Lender's interest in the Property or rights under this Security Instrument.  Trustor can cure such a default and, if acceleration has occurred, reinstate as provided in Section 18, by causing the action or proceeding to be dismissed with a ruling that, in Lender's judgment, precludes forfeiture of the Property or other material impairment of Lender's interest in the Property or rights under this Security Instrument.  The proceeds of any award or claim for damages that are attributable to the impairment of Lender's interest in the Property are hereby assigned and shall be paid to Lender.

All Miscellaneous Proceeds that are not applied to restoration or repair of the Property shall be applied in the order provided for in Section 2, subject to the rights of any lienholder with rights to Miscellaneous Proceeds that are superior to Lender's rights.

**11. Borrower Not Released; Forbearance By Lender Not a Waiver.**  Extension of the time for payment or modification of amortization of the sums secured by this Security Instrument granted by Lender to Borrower shall not operate to release the liability of Trustor or any Successors in Interest of Trustor. Lender shall not be required to commence proceedings against any Successor in Interest of Trustor or to refuse to extend time for payment or otherwise modify amortization of the sums secured by this Security Instrument by reason of any demand made by the original Trustor or any Successors in Interest of Trustor.  Any forbearance by Lender in exercising any right or remedy including, without limitation, Lender's acceptance of payments from third persons, entities or Successors in Interest of Trustor or in

amounts less than the amount then due, shall not be a waiver of or preclude the exercise of any right or remedy.

**12. Joint and Several Liability; Co-signers; Successors and Assigns Bound.** Borrower covenants and agrees that Borrower's obligations and liability shall be joint and several. Trustor covenants and agrees that Trustor's obligations and liability shall be joint and several. However, any Trustor who signs this Security Instrument but is not a Borrower (i.e., a "co-signer"): (a) is signing this Security Instrument only to mortgage, grant and convey the co-signer's interest in the Property under the terms of this Security Instrument; (b) is not personally obligated to pay the sums secured by this Security Instrument; and (c) agrees that Lender and Borrower can agree to extend, modify, forbear or make any accommodations with regard to the terms of this Security Instrument or the Debt Instrument without the co-signer's consent.

Subject to the provisions of Section 17, any Successor in Interest of Trustor who assumes Trustor's obligations under this Security Instrument in writing, and is approved by Lender, shall obtain all of Trustor's rights and benefits under this Security Instrument. Trustor shall not be released from Trustor's obligations and liability under this Security Instrument unless Lender agrees to such release in writing. The covenants and agreements of this Security Instrument shall bind (except as provided in Section 19) and benefit the successors and assigns of Lender.

**13. Loan Charges.** Lender may charge Borrower fees for services performed in connection with a default by either Borrower or Trustor, for the purpose of protecting Lender's interest in the Property and rights under this Security Instrument, including, but not limited to, attorneys' fees, property inspection and valuation fees. In regard to any other fees, the absence of express authority in this Security Instrument to charge a specific fee to Borrower shall not be construed as a prohibition on the charging of such fee. Lender may not charge fees that are expressly prohibited by this Security Instrument or by Applicable Law.

If the Loan is subject to a law which sets maximum loan charges, and that law is finally interpreted so that the interest or other loan charges collected or to be collected in connection with the Loan exceed the permitted limits, then: (a) any such loan charge shall be reduced by the amount necessary to reduce the charge to the permitted limit; and (b) any sums already collected from Borrower which exceeded permitted limits will be refunded to Borrower. Lender may choose to make this refund by reducing the principal owed under the Debt Instrument or by making a direct payment to Borrower. If a refund reduces principal, the reduction will be treated as a partial prepayment without any prepayment charge (whether or not a prepayment charge is provided for under the Debt Instrument). Borrower's acceptance of any such refund made by direct payment to Borrower will constitute a waiver of any right of action Borrower might have arising out of such overcharge.

**14. Notices.** Unless otherwise described in the Debt Instrument or in another agreement between Borrower and Lender or Trustor and Lender, the following provisions regarding notices shall apply. All notices given by Borrower, Trustor or Lender in connection with this Security Instrument must be in writing. Any notice to Borrower or Trustor in connection with this Security Instrument shall be deemed to have been given when mailed by first class mail or when actually delivered to the notice address if sent by other means. Notice to any one Borrower shall constitute notice to all Borrowers unless Applicable Law expressly requires otherwise. Notice to any one Trustor shall constitute notice to all Owners unless Applicable Law expressly requires otherwise. The notice address shall be the Property Address unless Borrower or Trustor has designated a substitute notice address by notice to Lender. Borrower shall promptly notify Lender of Borrower's change of address. Trustor shall promptly notify Lender of Trustor's change of address. If Lender specifies a procedure for reporting a change of address, then Borrower or Trustor shall only report a change of address through that specified procedure. There may be only one designated notice address for Borrower under the Loan at any one time. If no Borrower is also an Trustor there may be one additional designated notice address for Trustor. Any notice to Lender shall be given by delivering it or by mailing it by first class mail to Lender's address stated herein unless Lender has designated another address by notice to Borrower or Trustor. Any notice in connection with this Security Instrument shall not be deemed to have been given to Lender until actually received by Lender. If any notice required by this Security Instrument is also required under Applicable Law, the Applicable Law requirement will satisfy the corresponding requirement under this Security Instrument.

**15. Governing Law; Severability; Rules of Construction.** This Security Instrument shall be governed by federal law and, to the extent not preempted by federal law, the law of the jurisdiction in which the Property is located. All rights and obligations contained in this Security Instrument are subject to any requirements and limitations of Applicable Law. Applicable Law might explicitly or implicitly allow the parties to agree by contract or it might be silent, but such silence shall not be construed as a prohibition against agreement by contract. In the event that any provision or clause of this Security Instrument or the Debt Instrument conflicts with Applicable Law, such conflict shall not affect other provisions of this Security Instrument or the Debt Instrument which can be given effect without the conflicting provision.

As used in this Security Instrument: (a) words of the masculine gender shall mean and include corresponding neuter words or words of the feminine gender; (b) words in the singular shall mean and include the plural and vice versa; (c) the word "may" gives sole discretion without any obligation to take any action; and (d) headings that appear at the beginning of the sections of this Security Instrument are inserted for the convenience of the reader only, shall not be deemed to be a part of this Security Instrument, and shall not limit, extend, or delineate the scope or provisions of this Security Instrument.

**16. Borrower's and Trustor's Copy.** Borrower shall be given one copy of the Debt Instrument and of this Security Instrument. Any Trustor that is not also a Borrower shall also be given one copy of the Debt Instrument and of this Security Instrument.

**17. Transfer of the Property or a Beneficial Interest in Trustor.** As used in this Section 17, "Interest in the Property" means any legal or beneficial interest in the Property, including, but not limited to, those beneficial interests transferred in a bond for deed, contract for deed, installment sales contract or escrow agreement, the intent of which is the transfer of title by Trustor at a future date to a purchaser.
If all or any part of the Property or any Interest in the Property is sold or transferred (or if Trustor is not a natural person and a beneficial interest in Trustor is sold or transferred) without Lender's prior written consent, Lender may require immediate payment in full of all sums secured by this Security Instrument. However, this option shall not be exercised by Lender if such exercise is prohibited by Applicable Law.

If Lender exercises this option, Lender shall give Trustor notice of acceleration (and shall notify Borrower as well, if no Trustor is a Borrower). The notice shall provide a period of not less than 30 days from the date the notice is given in accordance with Section 14 within which all sums secured by this Security Instrument must be paid. If these sums are not paid to Lender prior to the expiration of this period, Lender may invoke any remedies permitted by this Security Instrument without further notice or demand on Borrower or Trustor.

**18. Trustor's Right to Reinstate After Acceleration.** If Trustor meets certain conditions and the Property is not a multifamily (2-4 family) dwelling, Trustor shall have the right to have enforcement of this Security Instrument discontinued at any time prior to the earliest of: (a) five days before sale of the Property pursuant to any power of sale contained in this Security Instrument; (b) such other period as Applicable Law might specify for the termination of Trustor's right to reinstate; or (c) entry of a judgment enforcing this Security Instrument. Those conditions are that: (a) Lender is paid all sums which then would be due under this Security Instrument and the Debt Instrument as if no acceleration had occurred; (b) any default of any other covenant or agreement is cured; (c) all expenses incurred in enforcing this Security Instrument, including, but not limited to, reasonable attorneys' fees, property inspection and valuation fees, and other fees incurred for the purpose of protecting Lender's interest in the Property and rights under this Security Instrument are paid to Lender; and (d) such action as Lender may reasonably require is taken to assure that Lender's interest in the Property and rights under this Security Instrument, and Borrower's obligation to pay the sums secured by this Security Instrument, shall continue unchanged. Lender may require that such reinstatement sums and expenses be paid in one or more of the following forms, as selected by Lender: (a) cash; (b) money order; (c) certified check, bank check, treasurer's check or cashier's check, provided any such check is drawn upon an institution whose deposits are insured by a federal agency, instrumentality or entity; or (d) Electronic Funds Transfer. Upon reinstatement, this Security Instrument and obligations secured hereby shall remain fully effective as if no acceleration had occurred. However, Trustor shall have the right to reinstate only once in any 24-month period, and this right to reinstate shall not apply in the case of acceleration under Section 17.

**19. Sale of Debt Instrument; Change of Loan Servicer; Notice of Grievance.** The Debt Instrument or a partial interest in the Debt Instrument (together with this Security Instrument) can be sold one or more times without prior notice to either Trustor or Borrower. A sale might result in a change in the entity (known as the "Loan Servicer") that collects Periodic Payments due under the Debt Instrument and this Security Instrument and performs other mortgage loan servicing obligations under the Debt Instrument, this Security Instrument, and Applicable Law. There also might be one or more changes of the Loan Servicer unrelated to a sale of the Debt Instrument. If there is a change of the Loan Servicer, Borrower will be given written notice of the change. The notice will state the name and address of the new Loan Servicer and the address to which payments should be made. The notice will include any other information required by Applicable Law in connection with a notice of transfer of servicing. If the Debt Instrument is sold and thereafter the Loan is serviced by a Loan Servicer other than the purchaser of the Debt Instrument, the mortgage loan servicing obligations to Borrower will remain with the Loan Servicer or be transferred to a successor Loan Servicer and are not assumed by the purchaser of the Debt Instrument unless otherwise provided by the purchaser of the Debt Instrument.

Neither Borrower, Trustor or Lender may commence, join, or be joined to any judicial action (as either an individual litigant or the member of a class) that arises from the other party's actions pursuant to this Security Instrument or that alleges that the other party has breached any provision of, or any duty owed by reason of, this Security Instrument, until such Borrower, Trustor or Lender has notified the other party (with such notice given in compliance with the requirements of Section 14) of such alleged breach and afforded the other party hereto a reasonable period after the giving of such notice to take corrective action. If Applicable Law provides a time period that must elapse before certain action can be taken, that time period will be deemed to be reasonable for purposes of this paragraph. The notice of acceleration and opportunity to cure given pursuant to Section 21 and the notice of acceleration given pursuant to Section 17 shall be deemed to satisfy the notice and opportunity to take corrective action provisions of this Section 19. If Borrower and Lender or Trustor and Lender have entered into an agreement to arbitrate disputes, the provisions of any such arbitration agreement shall supersede any provision in this Section 19 that would conflict with the arbitration agreement.

**20. Hazardous Substances.** As used in this Section 20: (a) "Hazardous Substances" are those substances defined as toxic or hazardous substances, pollutants, or wastes by Environmental Law and the following substances: gasoline, kerosene, other flammable or toxic petroleum products, toxic pesticides and herbicides, volatile solvents, materials containing asbestos or formaldehyde, and radioactive materials; (b) "Environmental Law" means federal laws and laws of the jurisdiction where the Property is located that relate to health, safety or environmental protection; (c) "Environmental Cleanup" includes any response action, remedial action, or removal action, as defined in Environmental Law; and (d) an "Environmental Condition" means a condition that can cause, contribute to, or otherwise trigger an Environmental Cleanup.

Trustor shall not cause or permit the presence, use, disposal, storage, or release of any Hazardous Substances, or threaten to release any Hazardous Substances, on or in the Property. Trustor shall not do, nor allow anyone else to do, anything affecting the Property (a) that is in violation of any Environmental Law, (b) which creates an Environmental Condition, or (c) which, due to the presence, use, or release of a Hazardous Substance, creates a condition that adversely affects the value of the Property. The preceding two sentences shall not apply to the presence, use, or storage on the Property of small quantities of Hazardous Substances that are generally recognized to be appropriate to normal residential uses and to maintenance of the Property (including, but not limited to, hazardous substances in consumer products).

Trustor shall promptly give Lender written notice of (a) any investigation, claim, demand, lawsuit or other action by any governmental or regulatory agency or private party involving the Property and any Hazardous Substance or Environmental Law of which Trustor has actual knowledge, (b) any Environmental Condition, including but not limited to, any spilling, leaking, discharge, release or threat of release of any Hazardous Substance, and (c) any condition caused by the presence, use or release of a Hazardous Substance which adversely affects the value of the Property. If Trustor learns, or is notified by any governmental or regulatory authority, or any private party, that any removal or other remediation of any Hazardous Substance affecting the Property is necessary, Trustor shall promptly take all necessary remedial actions in accordance with Environmental Law. Nothing herein shall create any obligation on Lender for an Environmental Cleanup.

**NON-UNIFORM COVENANTS.** Trustor and Lender further covenant and agree as follows:

**21. Acceleration; Remedies. Lender shall give notice to Trustor prior to acceleration following breach of any covenant or agreement in this Security Instrument (but not prior to acceleration under Section 17 unless Applicable Law provides otherwise). The notice shall specify: (a) the default; (b) the action required to cure the default; (c) a date, not less than 30 days from the date the notice is given, by which the default must be cured; and (d) that failure to cure the default on or before the date specified in the notice may result in acceleration of the sums secured by this Security Instrument and sale of the Property. The notice shall further inform Trustor of the right to reinstate after acceleration and the right to bring a court action to assert the non-existence of a default or any other defense of Trustor to acceleration and sale. If the default is not cured on or before the date specified in the notice, Lender at its option may require immediate payment in full of all sums secured by this Security Instrument without further demand and may invoke the power of sale and any other remedies permitted by Applicable Law. Lender shall be entitled to collect all expenses incurred in pursuing the remedies provided in this Section 21, including, but not limited to, reasonable attorneys' fees and costs of title evidence.**

**If Lender invokes the power of sale, Lender shall send written notice as prescribed by Applicable Law to Trustor and to the other persons prescribed by Applicable Law of the occurrence of an event of default and of Lender's election to cause the Property to be sold. Trustee shall give notice of sale by public advertisement as Trustee deems proper to protect the interests of Trustor and Lender. After the time required by Applicable Law, Trustee, without demand on Trustor, shall sell the Property at public auction to the highest bidder at the time and place and under the terms designated in the notice of sale in one or more parcels and in any order Trustee determines. Trustee may postpone sale of any parcel of the Property by public announcement at the time and place of any previously scheduled sale. Lender or its designee may purchase the Property at any sale.**

**Trustee shall deliver to the purchaser Trustee's deed conveying the Property without any covenant or warranty, expressed or implied. The recitals in the Trustee's deed shall be prima facie evidence of the truth of the statements made therein. Trustee shall apply the proceeds of the sale in the following order: (a) to all expenses of the sale, including, but not limited to, Trustee's fees of % of the gross sale price and reasonable attorneys' fees; (b) to all sums secured by this Security Instrument; and (c) any excess to the person or persons legally entitled to it.**

**22. Release.** Upon payment of all sums secured by this Security Instrument, Lender shall request Trustee to release this Security Instrument and shall surrender all notes evidencing debt secured by this Security Instrument to Trustee. Trustee shall release this Security Instrument. Borrower shall pay any recordation costs. Lender may charge a fee for releasing this Security Instrument, but only if the fee is paid to a third party for services rendered and the charging of the fee is permitted under Applicable Law.

**23. Substitute Trustee.** Lender, at its option, may from time to time remove Trustee and appoint a successor trustee to any Trustee appointed hereunder by recording a Deed of Appointment. Without conveyance of the Property, the successor trustee shall succeed to all the title, power and duties conferred upon Trustee herein and by Applicable Law.

**24. Multifamily Dwelling Covenants.** If the Property is a multifamily (2-4 family) dwelling, the following lettered paragraphs are additional covenants of this Security Instrument:

    **A. Use of Property; Compliance with Law.** Trustor shall not seek, agree to or make a change in the use of the Property or its zoning classification, unless Lender has agreed in writing to the change. Trustor shall comply with all laws, ordinances, regulations and requirements of any governmental body applicable to the Property.

    **B. Subordinate Liens.** Except as permitted by federal law, Trustor shall not allow any lien inferior to this Security Instrument to be perfected against the Property without Lender's prior written permission.

C. **Assignment of Leases.** Upon Lender's request after default, Trustor shall assign to Lender all leases of the Property and all security deposits made in connection with leases of the Property. Upon the assignment, Lender shall have the right to modify, extend or terminate the existing leases and to execute new leases, in Lender's sole discretion. As used in this paragraph C, the word "lease" shall mean "sublease" if this Security Instrument is on a leasehold.

D. **Assignment of Rents; Appointment of Receiver; Lender in Possession.** Trustor absolutely and unconditionally assigns and transfers to Lender all the rents and revenues ("Rents") of the Property, regardless of to whom the Rents of the Property are payable. Trustor authorizes Lender or Lender's agents to collect the Rents, and agrees that each tenant of the Property shall pay the Rents to Lender or Lender's agents. However, Trustor shall receive the Rents until (i) Lender has given Trustor notice of default pursuant to Section 21 of this Security Instrument and (ii) Lender has given notice to the tenant(s) that the Rents are to be paid to Lender or Lender's agent. This assignment of Rents constitutes an absolute assignment and not an assignment for additional security only.

If Lender gives notice of default to Trustor: (i) all Rents received by Trustor shall be held by Trustor as trustee for the benefit of Lender only, to be applied to the sums secured by this Security Instrument; (ii) Lender shall be entitled to collect and receive all of the Rents of the Property; (iii) Trustor agrees that each tenant of the Property shall pay all Rents due and unpaid to Lender or Lender's agents upon Lender's written demand to the tenant; (iv) unless applicable law provides otherwise, all Rents collected by Lender or Lender's agents shall be applied first to the costs of taking control of and managing the Property and collecting the Rents, including, but not limited to, attorney's fees, receiver's fees, premiums on receiver's bonds, repair and maintenance costs, insurance premiums, taxes, assessments and other charges on the Property, and then to the sums secured by this Security Instrument; (v) Lender, Lender's agents or any judicially appointed receiver shall be liable to account for only those Rents actually received; and (vi) Lender shall be entitled to have a receiver appointed to take possession of and manage the Property and collect the Rents and profits derived from the Property without any showing as to the inadequacy of the Property as security.

If the Rents of the Property are not sufficient to cover the costs of taking control of and managing the Property and of collecting the Rents any funds expended by Lender for such purposes shall become indebtedness of Borrower to Lender secured by this Security Instrument pursuant to Section 9.

Trustor represents and warrants that Trustor has not executed any prior assignment of the Rents and has not performed, and will not perform, any act that would prevent Lender from exercising its rights under this paragraph.

Lender, or Lender's agents or a judicially appointed receiver, shall not be required to enter upon, take control of or maintain the Property before or after giving notice of default to Trustor. However, Lender, or Lender's agents or a judicially appointed receiver, may do so at any time when a default occurs. Any application of Rents shall not cure or waive any default or invalidate any other right or remedy of Lender. This assignment of Rents of the Property shall terminate when all the sums secured by this Security Instrument are paid in full.

E. **Cross-Default.** Borrower's or Trustor's default or breach under any note or agreement in which Lender has an interest shall be a breach under this Security Instrument and Lender may invoke any of the remedies permitted by this Security Instrument.

**25. Condominium and PUD Covenants.** If the Property is a unit in a Condominium Project or a Planned Unit Development, the following lettered paragraphs are additional covenants of this Security Instrument:

A. **PUD or Condominium Obligations.** Trustor shall perform all of Trustor's obligations under the Constituent Documents of the PUD or the Condominium Project, as applicable. If the Property is part of a PUD, the "Constituent Documents" are the (i) Declaration; (ii) articles of incorporation, trust instrument or any equivalent document which creates the Owners Association; and (iii) any by-laws or other rules or regulations of the Owners Association. If the Property is part of a Condominium Project, the "Constituent Documents" are the: (i) Declaration or any other document which creates the Condominium Project; (ii) by-laws; (iii) code of regulations; and (iv) other equivalent documents. In either case, Trustor shall promptly pay, when due, all dues and assessments imposed pursuant to the Constituent Documents.

B. **Property Insurance.** So long as the Owners Association maintains, with a generally accepted insurance carrier, a "master" or "blanket" policy insuring the Property located within the Condominium Project or PUD, as applicable, which is satisfactory to Lender and which provides insurance coverage in the amounts (including deductible levels), for the periods, and against loss by fire, hazards included within the term "extended coverage," and any other hazards, including, but not limited to, earthquakes and floods, for which Lender requires insurance, then: (i) Lender waives the provision in Section 3 for the Periodic Payment to Lender of the yearly premium installments for property insurance on the Property; and (ii) Trustor's obligation under Section 5 to maintain property insurance coverage on the Property is deemed satisfied to the extent that the required coverage is provided by the Owners Association policy.

What Lender requires as a condition of this waiver can change during the term of the loan. Trustor shall give Lender prompt notice of any lapse in required property insurance coverage provided by the master or blanket policy.

In the event of a distribution of property insurance proceeds in lieu of restoration or repair following a loss to the Property, whether to the condominium unit or to the common elements of the Condominium Project, or, if the Property is part of a PUD, to common areas and facilities of the PUD, any proceeds payable to Trustor are hereby assigned and shall be paid to Lender. Lender shall

# EXHIBIT B

UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

Andrea Cannon, on behalf of
herself and all others similarly situated,

Case No. _____

         Plaintiff,

v.

WELLS FARGO BANK, N.A.;
WELLS FARGO INSURANCE INC.;
QBE SPECIALTY INSURANCE CO.; and
STERLING NATIONAL INSURNACE
AGENCY, INC. (n/k/a QBE FIRST
INSURANCE AGENCY, INC.),

         Defendants.

Removed from the Superior
Court of the District of
Columbia
Civil Action No.
2012 CA 002101 B

/

## DECLARATION OF MARK CHAPMAN

I, Mark Chapman, do hereby declare:

1. The statements in this declaration are based upon my personal knowledge and my review of QBE FIRST Insurance Agency, Inc.'s and QBE Specialty Insurance Co.'s (together "QBE") business records, and I am competent to testify to the matters set forth herein.

2. QBE's business records are made and maintained in the ordinary course of business at or near the time of the occurrence by a person with knowledge of the matters set forth in such records.

3. QBE Specialty Insurance Company ("QBE Specialty") is incorporated in North Dakota. QBE Specialty conducts its business out of its corporate headquarters in New York.

1

4. QBE FIRST Insurance Agency, Inc. ("QBE FIRST") is incorporated in California. QBE FIRST conducts its business out of its corporate headquarters in Georgia.

5. As a Senior Vice President at QBE FIRST, I am responsible for product compliance and underwriting with regard to QBE FIRST's lender-placed hazard insurance program. As such, I have personal knowledge regarding the number of Wells Fargo Bank, N.A.'s borrowers who were charged for lender-placed hazard insurance coverage that was placed by QBE FIRST.

6. I have reviewed the Complaint filed in this action, which indicates, *inter alia*, that plaintiff seeks to certify a class of Wells Fargo Bank, N.A. borrowers in the District of Columbia who "were charged for [a] force-placed insurance policy procured through Defendants." (*See* Complaint ¶¶ A, 1, 47.)

7. There are 738 District of Columbia consumers who fall within this putative class as alleged, *i.e.*, Wells Fargo Bank, N.A. borrowers in the District of Columbia who were charged for LPI hazard policies placed by QBE FIRST between March 5, 2009 and March 5, 2012 that were not subsequently cancelled in full.

I declare under the penalty of perjury that the foregoing is true and correct.

Executed this 23rd day of March, 2012 at Atlanta, GA.

Mark Chapman
**Senior Vice President**
QBE FIRST Insurance Agency, Inc.

2

# EXHIBIT C

D.C. Courts Home

# Court Cases Online

Case Search for: 2012 CA 002101

Click here to view search criteria

Search retrieved 1 case in less than a second.

Selected 1 cases to view

Click here to view search results

Viewing single case; Details retrieved in less than a second.

Click here to view case summary

| 2012 CA 002101 B: CANNON, ANDREA Vs. WELLS FARGO, BANK N.A, et al. | |
|---|---|
| Case Type: Civil II | File Date: 03/05/2012 |
| Status: Open | Status Date: 03/05/2012 |
| Disposition: Undisposed | Disposition Date: |

| Party Name | Party Alias(es) | Party Type | Attorney(s) |
|---|---|---|---|
| CANNON, ANDREA | | PLAINTIFF | SPIKES, Mr HARRY T |
| WELLS FARGO, BANK N.A | | Defendant | |
| QBE SPECIALTY INSURANCE CORPORATION | QBE FIRST INSURANCE AGENCY, INC | Defendant | |
| WELLS FARGO INSURANCE CORPORATION | | Defendant | |

| Schedule Date | Schedule Time | Description |
|---|---|---|
| 06/15/2012 | 09:30 AM | Initial Scheduling Conference-60 |

| Docket Date | Description | Messages |
|---|---|---|
| 03/15/2012 | Proof of Service | Proof of Service<br>Method : Service Issued<br>Issued : 03/06/2012<br>Service : Summons Issued<br>Served : 03/08/2012<br>Return : 03/15/2012<br>On : WELLS FARGO INSURANCE CORPORATION<br>Signed By : M. SILVA<br><br>Reason : Proof of Service<br>Comment :<br><br>Tracking #: 5000112911 |
| 03/15/2012 | Affidavit of Service of Summons & Complaint on | Affidavit of Service of Summons & Complaint by Mail on WELLS FARGO INSURANCE CORPORATION (Defendant); |
| 03/15/2012 | Proof of Service | Proof of Service<br>Method : Service Issued<br>Issued : 03/06/2012<br>Service : Summons Issued<br>Served : 03/08/2012<br>Return : 03/15/2012<br>On : QBE SPECIALTY INSURANCE CORPORATION |

| Docket Date | Description | Messages |
|---|---|---|
| 03/15/2012 | Affidavit of Service of Summons & Complaint on | Signed By : S. WILLIAMS<br><br>Reason : Proof of Service<br>Comment :<br><br>Tracking #: 5000112910<br>Affidavit of Service of Summons & Complaint by Mail on QBE SPECIALTY INSURANCE CORPORATION (Defendant); |
| 03/06/2012 | Service Issued | Issue Date: 03/06/2012<br>Service: Summons Issued<br>Method: Service Issued<br>Cost Per: $<br><br>WELLS FARGO, BANK N.A<br>PO BOX 8129<br>JACKSONVILLE, FL 32239<br>Tracking No: 5000112909<br><br>QBE SPECIALTY INSURANCE CORPORATION<br>210 INTERSTATE NORTH PKWY<br>ATLANTA, GA 30339<br>Tracking No: 5000112910<br><br>WELLS FARGO INSURANCE CORPORATION<br>PO BOX 8129<br>JACKSONVILLE, FL 32239<br>Tracking No: 5000112911 |
| 03/05/2012 | Event Scheduled | Event Scheduled<br>Event: Initial Scheduling Conference-60<br>Date: 06/15/2012 Time: 9:30 am<br>Judge: EDELMAN, TODD E Location: Courtroom A-49 |
| 03/05/2012 | Complaint for Breach of Contract Filed | Complaint for Breach of Contract Filed<br>Attorney: SPIKES, Mr HARRY T (372091)<br>ANDREA CANNON (PLAINTIFF); Receipt: 219094 Date: 03/05/2012 |

| Receipt # | Date | From | Payments | | Fee | | Amount Paid |
|---|---|---|---|---|---|---|---|
| 219094 | 03/05/2012 | SPIKES, Mr HARRY T | Cc | $120.00 | Cost | $120.00 | $120.00 |